MARC M. SELTZER (54534)
mseltzer@susmangodfrey.com
STEVEN SKLAVER (237612)
ssklaver@susmangodfrey.com
KRYSTA KAUBLE PACHMAN (280951)
kpachman@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Phone: (310) 789-3100
Fax:    (310) 789-3150

RAJ MATHUR (admitted *pro hac vice*)
rmathur@susmangodfrey.com
MORGAN MCCOLLUM (admitted *pro hac vice*)
mmccollum@susmangodfrey.com
SUSMAN GODFREY L.L.P.
One Manhattan West, Fl. 50
New York, NY 10001
Phone: (212) 729-2051
Fax:    (212) 336-8340

Attorneys for Lead Plaintiff Christine Pino

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| CHRISTINE PINO, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CARDONE CAPITAL, LLC, GRANT CARDONE, CARDONE EQUITY FUND V, LLC, and CARDONE EQUITY FUND VI, LLC,<br><br>Defendants. | Case No. 2:20-cv-08499-JFW (KS)<br><br>**CLASS ACTION**<br><br>**REPLY BRIEF IN SUPPORT OF AMENDED MOTION FOR CURATIVE NOTICE AND RELATED RELIEF**<br><br>Motion Hearing Date: 8/3/2026<br>Discovery Cutoff Date: 11/16/2026<br>Pretrial Conference Date: 2/12/2027<br>Trial Date: 3/3/2027 |

# **Table of Contents**

I.    DEFENDANTS' BUYOUT OFFERS AND SOCIAL MEDIA POSTS VIOLATE THE COURT'S ORDER ...................................................... 1

    A.    Defendants' Buyout Offer to Mr. Lugo Violates the Court's Order ............................................................................................. 1

    B.    Defendants' Solicitation of Opt Outs is Improper ............................. 2

    C.    Defendants' Social Media Posts are Misleading.................................. 5

II.    CURATIVE NOTICE IS APPROPRIATE.......................................................... 6

III.    INVALIDATING OPT OUTS IS AN APPROPRIATE REMEDY ............... 7

IV.    LIMITING DEFENDANTS' CONTINUED CONDUCT WITH CLASS MEMBERS IS NECESSARY .............................................................. 9

V.    DISCLOSURE OF EX PARTE CONVERSATIONS IS WARRANTED ......................................................................................................... 10

VI.    DEFENDANTS' CRITICISM OF THE COURT-APPROVED NOTICE PROGRAM IS MISGUIDED .......................................................... 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Camp v. Alexander*,
300 F.R.D. 617 (N.D. Cal. 2014) ...................................................................6

*Gerlach v. Wells Fargo & Co.*,
2006 WL 824652 (N.D. Cal. Mar. 28, 2006) ..................................................9

*Guifu Li v. A Perfect Day Franchise, Inc.*,
270 F.R.D. 509 (N.D. Cal. 2010) ...................................................................2

*Gulf Oil Co. v. Bernard*,
452 U.S. 89 (1981)......................................................................................2, 10

*Kleiner v. First Nat'l Bank*,
751 F.2d 1193 (11th Cir. 1985) ....................................................................10

*Laguna v. Coverall N. Am. Inc.*,
2010 WL 11508987 (S.D. Cal. Nov. 30, 2010)...............................................7

*Masonek v. Wells Fargo Bank*,
2009 WL 10672345 (C.D. Cal. Dec. 21, 2009)...............................................4

*Stark v. Patreon, Inc.*,
2025 WL 1592736 (N.D. Cal. June 5, 2025).....................................................9

*Talamantes v. PPG Industries, Inc.*,
2014 WL 4145405 (N.D. Cal. Aug. 21, 2014)..................................................9

*Torres Romero v. May Trucking*,
2018 WL 5905604 (C.D. Cal. Feb. 21, 2018) ..................................................7

*Wright v. Adventures Rolling Cross Country, Inc.*,
2012 WL 2239797 (N.D. Cal. June 15, 2012)...............................................3, 6

**Rules**

Rule 23 .....................................................................................................2, 3, 7

ii

The Court denied Defendants' motion to make buyout offers to Class Members for good reason. And Defendants did it anyway. Presumably they didn't issue the exact communication rejected by the Court (though Plaintiff cannot confirm that fact without additional discovery), but there is no question Defendants launched a buyback program in direct contravention of this Court's order. That buyback program is documented in specific offers made to specific class members, a public opt-out campaign across multiple social media posts, and mass emails to all Class Members.

More than 880 Class Members have now given up their right to participate in this case based on Defendants' misleading and coercive communications. There is no logical reason why a Class Member would opt out of this litigation when at the end of trial, if Plaintiff is successful, they will have a choice between rescission and keeping their investments in the Funds. Cardone's representations to the contrary have confused Class Members and hindered their ability to make a fully informed decision. This Court should correct the harms caused by Defendants' flagrant violation of the Court's order by issuing curative notice, rescinding the opt outs, limiting Defendants' continued communications with Class members, and permitting further discovery into Defendants' *ex parte* communications with Class members.

## I.  DEFENDANTS' BUYOUT OFFERS AND SOCIAL MEDIA POSTS VIOLATE THE COURT'S ORDER

### A.  Defendants' Buyout Offer to Mr. Lugo Violates the Court's Order

When Defendants asked this Court to bless their plan of making a buyout offer to Class Members, the Court rightfully denied Defendants' motion. Doc. No. 250. Defendants now claim that their "individual" buyout offers are different than the proposed mass buyout because they were made on an individual basis. But this argument was already rejected by the Court when noting that Defendants' buyout motion was asking the Court for permission "to negotiate what are essentially piecemeal settlements with individual Class Members." *Id.* at 3. Those "piecemeal settlements" are exactly what Defendants have pursued and now argue comply with the Court's

order. Defendants also argue that their offer to Mr. Lugo was responding "with the same ordinary course offer it has made, over the years, to other investors wanting to be bought out of their investments." Opp. at 2. But the Court rejected this justification too. Doc. No. 250 at 3 (rejecting Defendants' argument that the buyout offer was "consistent with what Mr. Cardone has done for investors in the past").

While Defendants now claim that there was nothing improper about their offer to Mr. Lugo, they concede in their Opposition that they deliberately held off on responding to Mr. Lugo's request for a refund while the buyout motion was pending, demonstrating that they were aware of the Court's oversight role under Rule 23(d). But when Defendants did not get their preferred response from the Court, they simply ignored the Order and offered to buy Mr. Lugo's investment. The fact that Mr. Lugo declined to accept the offer does not cure the impropriety of the offer.

And it was not just Mr. Lugo. At Cardone Capital, LLC's Rule 30(b)(6) deposition, Grant Cardone testified that he "gave probably 600 grand back last week from some of the people that don't want to be involved in what they called a bull**** class action lawsuit" and planned to buyout many more investors. Transcript of Cardone Capital, LLC's Rule 30(b)(6) Deposition, Ex. 2, at 341:5–10 (asterisks added); *see also id.* at 352:8–18 ("Last week I probably wrote checks for 4 or 500 grand . . . I bet you I do another 4 or 500 grand this week.").

B. Defendants' Solicitation of Opt Outs is Improper

"Courts applying the *Gulf Oil* standard have found that *ex parte* communications soliciting opt-outs, or even simply discouraging participation in a case, undermine the purposes of Rule 23 and require curative action by the court." *Guifu Li v. A Perfect Day Franchise, Inc.,* 270 F.R.D. 509, 517 (N.D. Cal. 2010) (citing *Kleiner v. First Nat'l Bank*, 751 F.2d 1193, 1202–03 (11th Cir. 1985) (finding opt outs needed to be invalidated and curative notice was required)).

While Plaintiff cannot know the full scope of Defendants' opt-out campaign, the communications filed with Plaintiff's amended motion underscore why the Court

properly denied Defendants' Buyout motion.  And Defendants' conduct here is even more egregious given the Court's explicit guidance highlighting the dangers of communicating with Class Members *ex parte*, noting the "strong likelihood that Class Members will be misled or confused by the 'buyout offer'" and the dangers of "sending the 'buyout offer' immediately after Class Members have received their class notices without a clear explanation or attempt to reconcile these two different notices," which would "lead to widespread confusion among the Class Members about how the 'buyout offer' might impact their decision to either opt out or remain in the Class."  Doc. No. 250 at 3.  Defendants have apparently attempted to insulate themselves from liability because the emails sent to investors did not directly communicate the "buyout offer" prohibited by this Court.  Even facially neutral communications from Defendants to Class members can chill class participation. *See Wright v. Adventures Rolling Cross Country, Inc.*, 2012 WL 2239797, at *5 (N.D. Cal. June 15, 2012) ("Whether the communications constitute actionable retaliation, whether they are privileged, and/or whether they were merely opinions made in good faith is largely unimportant. The critical question is whether there is a realistic danger that the communications will chill participation in the class action."). Here, the opt-out campaign communicating (which appears to have been coupled with investor calls, a social media campaign, and other outreach relaying a financial incentive for opting out) is anything but neutral.

For one, Defendants framed the decision by suggesting to investors that opting out was the preferable option.  But class members' decisions to opt out should be based on neutral, Court-approved information, not Defendants' one-sided characterization of the value of the litigation.  Indeed, Defendants told Class members:  "If you do nothing, you will be involved in the class action lawsuit, as discussed on the class action website. If you opt-out, you will NOT be involved in this lawsuit."  The language Defendants selected implies that absent class members who do not opt out will "be involved in the class action lawsuit" and will have to take action and affirmatively participate in the lawsuit.  This suggestion is inconsistent with Rule 23 and the Court approved notice,

3

which gave Class members two options:  "do nothing" or "ask to be excluded."  Doc. No. 234-4.

| YOUR LEGAL RIGHTS AND OPTIONS | |
| --- | --- |
| **Do Nothing** | • Stay in the Class<br>• You may get money or benefits that may come from trial or settlement. No class member will be forced against his will to terminate his investment as a result of this lawsuit. If Plaintiff were to prevail in this lawsuit, you would not receive any money or benefits from the lawsuit unless you choose to tender your shares in Funds V and VI.<br>• Be bound by all judgments in this case<br>• Give up your right to sue or continue to sue Defendants on your own for the claims in this lawsuit |
| **Ask to be Excluded ("Opt-Out")**<br><br>**Submit online or by mail by Month x, 202x** | • Remove yourself from the Class<br>• Get no money or benefits that may come from trial or settlement but continue to retain your investment(s) in the Funds<br>• You will not be bound by any judgments in this case<br>• Keep your right to sue or continue to sue Defendants, at your own expense, for the claims in this lawsuit |

This language, which is standard in class action notices, accurately describes the role and rights of absent class members.  In *Masonek v. Wells Fargo*, the court required curative notice where a company sent a letter that made "disconcerting statements about when and how absent class members must act to protect their rights." 2009 WL 10672345, at *3 (C.D. Cal. Dec. 21, 2009).  The court noted that the "most alarming" reference was a statement that mislead investors by "failing to explain the class action process and how a class action could potentially provide investors with a recovery without investors taking any current action." *Id.* Here, too, Defendants' communication is misleading in that it implies that investors who stay in the case will have to take affirmative action to participate in the lawsuit, which may lead class members to think that they have to hire their own counsel, participate in discovery, or attend trial, disincentivizing participation. It also fails to advise Class Members that if they stay in the Class and Plaintiff prevails at trial, they will have the opportunity to choose between rescission and staying invested in the Funds.

Defendants' claimed rationale for circumventing the Court's order is that investors were "confused." But even if investors actually were confused, the proper remedy was for Defendants to contact Class Counsel—not for Defendants to personally discuss this litigation and characterize Class Members' options using language the

Court had not approved. Had Defendants followed this proper procedure, the parties could have conferred about neutral language to cure any "confusion" among Class Members, submitted it for the Court's review, and issued a supplemental notice.

Defendants' email campaign ensured that Class Members would contact Defendants to receive one-sided information instead of contacting Class Counsel or JND. Defendants' email conveniently omits Class Counsel and JND's contact information while ensuring Class Members are provided with contact information for the Defendants: "If you have questions about the lawsuit, you will find more information in the email sent to you. If you want information about the investment or any of our upcoming opportunities, call the office at 305-407-0276 and speak to an Investor Relations professional." This is again at odds with one of the concerns the Court raised in its Order Denying Defendants' Buyout motion: "In addition, the Court is also concerned that the Class Members will likely be confused about who they should contact with questions because Defendants' notice fails to include any contact information for Class Counsel or JND Legal Administration, the class notice administrator." Doc. No. 250 at 3–4.

C. Defendants' Social Media Posts are Misleading

Defendants' opt-out campaign is particularly troubling when combined with Cardone's social media posts, which Defendants incredibly characterize as "general remarks about the American legal system." Opp. at 7. But Grant Cardone's posts were directly targeted to this case and the corresponding opt out campaign. Cardone's July 1 post publicly referred to an investor who opted out of the "Pino dispute" and had their shares redeemed, directly communicating to Class Members that there was a financial benefit associated with opting out. Doc. No. 256-4. This is not general commentary about the American legal system. It is a specific, contemporaneous announcement linking a Class Member's opt-out status with a tangible financial outcome during the opt-out period. Defendants' claim that the post "in no way encouraged investors to contact Defendants to sell their shares," Opp. at 7, is belied by the language of the posts.

Cardone's statements about a query he just so happened to copy and paste from Claude, an artificial intelligence assistant, fare no better: "#3 will blow your mind…. Attorneys take a large cut off the top.  Legal fees typically claim 25-35% of total settlement amounts under contingency arrangements, before administration costs and before money even reaches claimants." Doc. No. 256-7.  He made these statements during the opt out period of this lawsuit.  In the comments that followed, he was sure to confirm "This post was not about fund V – but it would qualify." Doc. No. 256-8.  Of course, even though he was already talking about Fund V in the post, he made sure there could be no confusion in the comments. In *Wright*, the Court found that a defendant's statement to class members that plaintiffs' counsel was "interested solely in a payoff" was "no doubt intended to encourage Plaintiffs and/or potential class members not to participate in the lawsuit" and "problematic." *Wright*, 2012 WL 2239797, at *5. So too here.

The same is true when Cardone—speaking about the "Pino dispute" and "fund V"—posted that "[t]he legal system in America is garbage.  It doesn't reward victims it rewards greedy lawyers." *Compare* Doc. No. 256-9 *with Camp v. Alexander*, 300 F.R.D. 617, 620 (N.D. Cal. 2014) (correspondence from defendants stated that the lawsuit was "motivated by greed and other improper factors").  Defendants now assert in their Opposition that these communications "do not reference plaintiff's counsel, let alone disparage them."  Opp. at 16.  But the posts speak for themselves. *See also Wright*, 2012 WL 2239797, at *1, *3 (describing lawyers as "aggressive and possibly unethical").  All these posts were designed to give Defendants the opportunity to make one-sided merits arguments about the financial calculus of staying in the Class, precisely the kind of arguments defendants are not supposed to make outside of the Court-approved notice process.

## II.   CURATIVE NOTICE IS APPROPRIATE

Curative notice is needed in these circumstances.  Defendants have issued countless communications to Class Members, multiplying the Court's well-founded

concerns about confusion and one-sided messaging.  It is important that Class Members know that the communications Defendants have been sending were not only unapproved but also neither permitted nor appropriate under Rule 23(d).  Despite Defendants' refusal to produce these communications, Plaintiff has "provided ample evidence of specific conduct" to support her allegations that Defendants' contacts were "coercive, misleading, and improper."  *Laguna v. Coverall N. Am. Inc.,* 2010 WL 11508987, at *2 (S.D. Cal. Nov. 30, 2010) (ordering curative notice) (cleaned up and citation omitted).

And these communications were particularly improper given Defendants *knew* the Court had rejected their prior Buyout Motion and orchestrated this opt out campaign anyway.  The Court's concerns about investor confusion, providing inaccurate information, and failing to provide contact information for Class Counsel and JND were all well-founded, and Defendants crafted a campaign that only magnified those concerns.  *Id.* at *11 (noting that it was appropriate for defendants to bear the cost of curative notice where defendants conducted meetings for the purposes of presenting their own one-sided account of the case and discouraging plaintiffs from joining a FLSA action).  While nothing can "unring the bell," curative notice is the best way to vindicate Class Members' rights so their decision to opt out is not based solely on the misleading and one-sided information they received from Defendants.

Defendants' analysis of *Torres* only further supports Plaintiff's position.  A curative notice correcting the impression created by Cardone's posts and communications is narrowly tailored to address a specific and documented misstatement. *See Torres Romero v. May Trucking*, 2018 WL 5905604, at **2–4 (C.D. Cal. Feb. 21, 2018).

## III.   INVALIDATING OPT OUTS IS AN APPROPRIATE REMEDY

The cumulative effects of Defendants' campaign, which involved (at a minimum) mass communications to investors, mass investor calls, individual buyout offers, and social media posts about this case, have resulted in 884 investors opting out of this case

7

(out of about 3300 class members). That number is large in any litigation, but particularly here where there is no incentive for Class Members to opt out. Were they to stay in the case, they could ultimately elect at the end of trial whether to rescind their shares or stay in the funds. There is simply no logical benefit to opting out at this stage of the litigation, and one can only conclude that those who opted out came to this conclusion because they were provided with misleading information by Defendants. Even in their Opposition, Defendants incorrectly state that Class Members are opting out "because the relief sought in this lawsuit would require investors to surrender interest in the Funds that are more valuable than the minimal rescissory relief they could receive." Wrong. As this Court explained in its class certification ruling, Class Members will be permitted to *choose* between rescission or staying in the Funds. Doc. No. 229 at 4–5 ("if Plaintiff prevails, investors can choose whether to 'tender' their shares and receive rescissory damages" (quoting 15 U.S.C. § 77k(e)). And if Defendants' counsel claim otherwise in their Opposition papers (contrary to this Court's holding and the statute's plain text), it's a near certainty Defendants and their employees spoon fed this inaccurate information to Class Members.

Class Members were mistakenly led to believe that declining to opt out would mean they had to affirmatively participate in this lawsuit, they were not provided with contact information for Class Counsel, and they were repeatedly advised that the financial calculus of staying in the lawsuit would be unfavorable. While Defendants have not disclosed the terms of the buyout offers, it is likely that those who elected to opt out took a deal worth less than the rescission remedy would be worth after trial. Indeed, Defendants' offer to Mr. Lugo is less than he would expect to receive after trial. And that's likely just the tip of the iceberg, as Defendants have refused to provide information regarding their communications with investors. In similar circumstances, courts have found it appropriate to invalidate opt-outs. *See, e.g., Stark v. Patreon, Inc.*, 2025 WL 1592736, at **15–16 (N.D. Cal. June 5, 2025) (invalidating 927 opt outs where class members were given incomplete and misleading information about a class

8

action settlement).

Defendants argue that the cases cited by Plaintiff are inapposite because some of the cases involved employers urging employees to opt out of a lawsuit.  Of course, the misconduct is the same regardless of the nature of Defendants' relationship with the class members.  But the coercive nature is even more pronounced here: the "everyday investors" in the Class have turned over substantial sums of money to Cardone Capital—in many cases their life savings or retirement accounts.  While employees may be able to find another employer, the Class Members here have no legal recourse against Defendants other than litigation to rescind their investments.[1]

## IV.    LIMITING DEFENDANTS' CONTINUED CONDUCT WITH CLASS MEMBERS IS NECESSARY

Given Defendants have *already* flouted the Court's prior guidance and had communications with Class Members that were not approved as part of the Court-ordered notice program, the Court should further limit Defendants' communications with Class Members going forward.  This would prevent Defendants from continuing the same type of campaign all over again.  Defendants incorrectly claim that such relief is unwarranted because it could limit Mr. Cardone's First Amendment rights.  Courts may limit "communications regarding ongoing litigation between a class and class opponents" using narrow limitations on speech. *Kleiner*, 751 F.2d at 1205–06. That is

---

[1] Defendants' cited case, *Gerlach v. Wells Fargo & Co.*, 2006 WL 824652 (N.D. Cal. Mar. 28, 2006) involved communications that were neutral and not combined with a campaign of making buyout offers or publicly disseminating misinformation about the case or class actions. And because *Gerlach* involved a defendant's conduct before certification, there was no court-approved language to be shared with class members; here, by contrast, the Court has ordered the precise information that should be communicated to Class Members about this litigation, including specific language about opting out. *Talamantes* is also inapposite because in a Fair Labor Standards Act action, defense counsel can communicate with the putative class so long as the communication does not "undermine or contradict the court's own notice." *Talamantes v. PPG Industries, Inc.*, 2014 WL 4145405, at *3 (N.D. Cal. Aug. 21, 2014) (citation omitted).  This case, of course, is not a FLSA action and the same rule does not apply.

exactly what Plaintiff seeks here: a narrowly tailored order prohibiting Defendants from communicating with Class Members other than for routine investment-related issues and from posting on social media about this litigation or class actions.[2] This satisfies *Gulf Oil Co. v. Bernard*'s requirement that Plaintiff demonstrates "a clear record and specific findings of need." 452 U.S. 89, 104 (1981).

Defendants' efforts to distinguish *Kleiner* are unavailing, as they claim their communications "do not resemble *Kleiner* in any way, shape, or form" because "Defendants did not embark on an orchestrated campaign to urge anyone in the class to opt out" and "Defendants have not purposefully violated any Court order." Opp. at 18. It strains credulity to understand how multiple social media posts (with thousands of views), multiple emails to all Class members, an investor call directed to the opt out deadline, and documented efforts to buy out individual investors does not constitute an "orchestrated campaign" to urge opt outs. And Defendants claiming they have not violated any Court order rings hollow: the language of Defendants' communications directly defies the Court's instructions and the Court should limit Defendants' further communications with Class members as a result.

## V.    DISCLOSURE OF EX PARTE CONVERSATIONS IS WARRANTED

Defendants have no basis by which to refuse additional discovery into their *ex parte* communications with investors. Their communications are hardly neutral, and the large number of opt outs combined with the opt out campaign lead to the inevitable conclusion that Mr. Lugo is one of many Class members who received an improper buyout offer. Additional discovery is warranted to confirm, *inter alia*, whether Class Members have signed releases with Defendants that further limit their rights in exchange for the improperly solicited buyouts.

## VI.    DEFENDANTS' CRITICISM OF THE COURT-APPROVED NOTICE

---

[2] Defendants suggest there is some ambiguity as to what communications would be permissible under this order. But to the extent Defendants have concerns, they can simply reach out to Class Counsel and, if necessary, the parties can seek the Court's guidance.

**PROGRAM IS MISGUIDED**

Defendants argue that Plaintiff "repudiated" an agreement to share the class-notice website with them in advance of its publication. Opp. 1. All three lawyers for the Class who attended the relevant meet and confer among counsel do not recall making such an agreement. In any event, even if there were some miscommunication between counsel, Defendants' arguments about the notice process simply reveal that Class Counsel promptly addressed and resolved any disagreements about the class notice website. A full email thread between counsel regarding the class notice website is attached to this motion as Exhibit 1. Upon receipt of Defendants' May 6, 2026 letter (Doc. No. 258-3), Class Counsel promptly worked to address Defendants' complaints about the class-notice website, provided them mock-up web pages so they could review them before publication, and accepted almost every requested modification (and where Class Counsel did not, explained why). Class Counsel worked in good faith to resolve Defendants' concerns with the class notice website.

Defendants finally suggest something untoward about the timing of the dissemination of the class notice. Class Counsel, however, did not dictate when the notice would be sent. And if Defendants believed that re-sending the class notice at a different time was necessary or prudent, they should have simply informed Class Counsel and then the parties could have reached an agreement, sought the Court's approval, and issued proper notice to the Class.

\* \* \*

In sum, the Court should grant Plaintiff's amended motion for curative notice and related relief.

Respectfully Submitted,

Dated:  July 20, 2026

MARC M. SELTZER
STEVEN G. SKLAVER
KRYSTA KAUBLE PACHMAN
RAJ MATHUR
MORGAN MCCOLLUM
SUSMAN GODFREY L.L.P.

11

By    */s/ Raj Mathur*
Raj Mathur
Attorneys for Lead Plaintiff

## <u>CERTIFICATION REGARDING AI USE</u>

The undersigned, counsel of record for Plaintiff and the Class, certifies that no Artificial Intelligence was used in the preparation of this brief or in any corresponding materials.

*/s/ Raj Mathur*

Raj Mathur
