MARC M. SELTZER (54534)
mseltzer@susmangodfrey.com
STEVEN G. SKLAVER (237612)
ssklaver@susmangodfrey.com
KRYSTA KAUBLE PACHMAN (280951)
kpachman@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Phone: (310) 789-3100
Fax: (310) 789-3150

RAJ MATHUR (admitted *pro hac vice*)
rmathur@susmangodfrey.com
MORGAN MCCOLLUM (admitted *pro hac vice*)
mmccollum@susmangodfrey.com
SUSMAN GODFREY L.L.P.
One Manhattan West, Fl. 50
New York, NY 10001
Phone: (212) 729-2051
Fax: (212) 336-8340

Attorneys for Lead Plaintiff Christine Pino and the Class

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| CHRISTINE PINO, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CARDONE CAPITAL, LLC, GRANT CARDONE, CARDONE EQUITY FUND V, LLC, and CARDONE EQUITY FUND VI, LLC,<br><br>Defendants. | Case No. 2:20-cv-08499-JFW (KS)<br><br>**CLASS ACTION**<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Motion Hearing Date: 12/07/2026 at 1:30pm<br>Discovery Cutoff Date: 11/16/2026<br>Pretrial Conference Date: 2/12/2027<br>Trial Date: 3/9/2027 |

## Table of Contents

INTRODUCTION .......... 1

I. Background .......... 3

A. Defendants Raise Money from "Everyday Investors" to Acquire Real Estate .......... 3

B. The SEC Found Cardone Had No Basis to Project a 15% Return .......... 4

C. Cardone Continued Telling Investors They Would Earn 15% Without Disclosing the SEC's Finding .......... 4

D. Cardone Told Investors He Was Responsible for the Funds' Debt .......... 6

E. Class Members Invest in Funds V and VI .......... 6

II. Procedural History .......... 7

III. Legal Standard .......... 7

ARGUMENT .......... 7

IV. Pino is Entitled to Summary Judgment on Her Omissions Theory .......... 8

A. The *Omnicare* Framework .......... 8

B. No Facts Relevant to Omissions Liability Under *Omnicare Prong (b)* Remain in Dispute .......... 9

C. Cardone's Omission is Material .......... 12

D. All Other Requirements for Liability Are Met .......... 13

V. There is No Dispute that Defendants Are Statutory Sellers .......... 15

VI. There is No Dispute That Cardone Does Not Personally Pay the Funds' Debt .......... 16

VII. Because Defendants Are Liable Under Section 12(a)(2), Class Members Are Entitled to Rescind Their Investments .......... 17

VIII. There Is No Dispute Grant Cardone and Cardone Capital, LLC Are Control Persons Under Section 15 .......... 19

CONCLUSION .......... 20

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abramson v. NewLink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020) ........ 11

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) ........ 9

*Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*,
817 A.2d 160 (Del. 2002) ........ 18

*Gustafson v. Alloyd Co., Inc.*,
513 U.S. 561 (1995) ........ 8

*In re Atossa Genetics Inc. Sec. Litig.*,
868 F.3d 784 (9th Cir. 2017) ........ 11, 13

*In re Livent, Inc.*,
360 F. Supp. 2d 568 (S.D.N.Y. 2005) ........ 19

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010) ........ 19

*In re Perrigo Co. PLC Sec. Litig.*,
2021 WL 3005657 (S.D.N.Y. July 15, 2021) ........ 14

*Merrick v. Hilton Worldwide, Inc.*,
867 F.3d 1139 (9th Cir. 2017) ........ 7

*Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008) ........ 8

*Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*,
575 U.S. 175 (2015) ........ *passim*

*Osterneck v. Ernst & Whinney*,
489 U.S. 169 (1989) ........ 18

*Pino v. Cardone Capital, LLC*,
139 F.4th 1102 (9th Cir. 2025) ........ 7, 8, 11, 17

*Pino v. Cardone Capital, LLC*,
2023 WL 2158802 (9th Cir. Feb. 22, 2023) .......... 7, 10, 11

*Pino v. Cardone Capital, LLC*,
55 F.4th 1253 (9th Cir. 2022) .......... 7, 15, 16, 19

*Pinter v. Dahl*,
486 U.S. 622 (1988) .......... 8, 15

*SEC v. Platforms Wireless Int'l Corp.*,
617 F.3d 1072 (9th Cir. 2010) .......... 14

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976) .......... 13

*Virginia Bankshares, Inc. v. Sandberg*,
501 U.S. 1083 (1991) .......... 12

**Statutes**

15 U.S.C. § 77l(a) .......... *passim*

15 U.S.C. § 77o(a) .......... 2, 7, 19, 20

Securities Act of 1933 .......... *passim*

**Rules**

Fed. R. Civ. P. 23(f) .......... 7

**Other Authorities**

H. Rep. No. 85, 73d Cong., 1st Sess. (1933), pp. 2–10 .......... 15

S. Rep. No. 47, 73d Cong., 1st Sess. (1933), pp. 6–7 .......... 15

## Introduction

In *Omnicare*, the Supreme Court held that if an issuer states an opinion "with knowledge that **the Federal Government [is] taking the opposite view**" and fails to disclose that fact, "**the investor** [] **has cause to complain**: He expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time." *Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, 575 U.S. 175, 188–89 (2015) (emphasis added).

That is exactly what happened here. Defendants projected 15% returns (and higher) to prospective investors on social media for Cardone Equity Funds V and VI, even though the United States Securities and Exchange Commission had told them they had no basis to make such claims. As prohibited in *Omnicare*: the Federal Government (here, the SEC) was taking the opposite view, Defendants told no one, and the certified class of investors in the Funds therefore is entitled to summary judgment.

The Ninth Circuit has twice addressed these issues, twice applied *Omnicare* to these facts, and twice concluded that Cardone's failure to disclose the SEC's finding to prospective investors supports omissions liability under Section 12(a)(2) of the Securities Act. These allegations deemed plausible by the Ninth Circuit (twice) have, after discovery, become undisputed facts:

- In July 2018, Defendants projected a 15% return in Cardone Equity Fund V's draft offering circular and submitted it to the SEC for its review and approval. Statement of Uncontroverted Facts and Conclusions of Law ("SOUF") ¶¶ 24–25.
- The SEC reviewed Fund V's offering circular, told Cardone he did not appear to have a basis to project a 15% return, and ordered him to either remove it from his offering circular or explain why it should remain. SOUF ¶¶ 32–33.
- Upon receiving the SEC's finding, Cardone could have pushed back by presenting contrary data or made additional disclosures about his investing

record and experience. But Cardone did neither. Instead, he deleted the 15% claim from his SEC filings. SOUF ¶¶ 36–38.

- Within hours and days of receiving the SEC's letter, Cardone told his "audience" that they would obtain a 15% return anyway. SOUF ¶¶ 45–46.
- In the months that followed, Cardone repeatedly projected 15% returns and even higher returns on social media. SOUF ¶¶ 48, 50, 52, 57, 59.
- In these statements to prospective investors promising 15% or higher returns, Cardone never disclosed that the SEC had found he had no basis to make such a claim. SOUF ¶¶ 49, 51, 53, 58, 60.

This is quintessential omissions liability under *Omnicare*, and all other requirements for Section 12(a)(2) liability are met. Using his massive social-media platform, Cardone raised tens of millions of dollars for the Funds, including "with a primary focus on individual non-accredited investors." SOUF ¶¶ 13, 23, 40, 43. Cardone's serial omissions entitle Plaintiff to summary judgment on her Section 12(a)(2) claim. If granted, this matter will be resolved on the merits and proceed to the rescission remedy phase of the case.

In addition to complete summary judgment on her omissions claim, Pino is also entitled to partial summary judgment on several additional grounds:

- Based on the undisputed record, Defendants are sellers within the meaning of the Securities Act because they either sold securities directly or solicited sales for securities on social media for financial gain. SOUF ¶¶ 9, 12, 44.
- Cardone told investors he was "responsible" for the Funds' debt service payments. SOUF ¶ 54. It is now undisputed, however, that the Funds' operating income—not Cardone—paid the debt service. SOUF ¶ 55. The Court should therefore grant summary judgment on the falsity of this debt statement.
- It is undisputed that Cardone Capital and Grant Cardone control Funds V and VI, SOUF ¶¶ 10–11, so the Court should grant summary judgment on the control requirement under Section 15 of the Securities Act.

There are no disputed facts underlying these three additional issues, and resolving them now will simplify any trial in this case.

Earlier this year, Cardone publicly boasted that he can say "whatever he wants" on social media, claimed social media is "unregulated," and even admitted that he "abuse[s]" social media. SOUF ¶ 16. Four years ago, the Ninth Circuit in this case made clear that the Securities Act applies with equal force to social media. Given the absence of any disputes of material fact, the Court should enforce the Securities Act, hold Cardone to account for his untrue statements, and offer class members the remedy Congress designed a century ago for such misconduct: rescission.

## I. Background

### A. Defendants Raise Money from "Everyday Investors" to Acquire Real Estate

Grant Cardone and Cardone Capital, LLC create equity funds to acquire real-estate assets. SOUF ¶ 4.[1] To raise money for those equity funds, Cardone turns to social media. He has millions of followers on social media across websites like Instagram, YouTube, and X (formerly Twitter), and uses social media to solicit investors. SOUF ¶¶ 13, 21 (Funds expected to draw investor base "largely" from "Cardone's exposure on social media and on media content delivered over the [Funds'] website"). On any given day, Cardone publishes reams of content across these channels—discussing real estate, investment opportunities, and his lifestyle. SOUF ¶ 20. He uses social media to target, in his words, "everyday investors." SOUF ¶ 14.

From late 2018 to 2020, Cardone raised money for Cardone Equity Funds V and VI. Because Funds V and VI were Regulation A offerings, they were open to non-accredited investors. SOUF ¶ 23. Non-accredited investors do not meet the SEC's wealth or income thresholds, SOUF ¶ 61, so are entitled to the greatest protections under the securities laws. Both Funds V and VI had a "primary focus" on raising money from

---

[1] Because Grant Cardone exerts absolute and total control over Cardone Capital, LLC, SOUF ¶ 12, this memorandum at times uses "Cardone" to refer to "Cardone Capital."

"individual non-accredited investors." SOUF ¶ 23.

B. The SEC Found Cardone Had No Basis to Project a 15% Return

Under Regulation A, the SEC must qualify offerings before issuers like Cardone can accept investor money. In July 2018, Cardone submitted Fund V's preliminary offering circular to the agency for review. In three different locations, Cardone's draft offering circular projected a 15% rate of return. SOUF ¶ 25. The draft circular also contained extensive disclosures about Cardone's investment history. SOUF ¶¶ 26–30 (disclosing bevy of financial data about earlier investments, including gross revenue, operating expenses, net income, taxable income from operations, cash generated from operations, cash generated after cash distributions). The circular described Cardone Equity Funds I and II as "similar in nature" to Fund V, and disclosed that neither had achieved a 15% return. SOUF ¶¶ 27–30. The SEC's Division of Corporation Finance reviewed the offering circular, told Cardone that he "d[id] not appear to have a basis for [a 15%] return," and ordered him to "revise to remove this disclosure throughout the offering statement." SOUF ¶¶ 31–33. The SEC also provided other comments on the draft circular. SOUF ¶ 35. The SEC made clear that if Cardone disagreed with a particular comment or did not believe it applied to him, he could tell the agency "why" in his response. SOUF ¶ 32.

Two days later, Cardone pushed back on various comments by the SEC in a lengthy letter. SOUF ¶ 36. But he did not challenge nor dispute the SEC's determination that his projections of 15% returns had zero basis. SOUF ¶¶ 36–38. Without any protest, he instead deleted these return projections from Fund V's offering document—and he never again included them in the offering materials for Fund V or Fund VI. SOUF ¶¶ 36, 39, 42.

C. Cardone Continued Telling Investors They Would Earn 15% Without Disclosing the SEC's Finding

Cardone testified that within "two hours" of the SEC's letter, he was back on social media "telling my audience, hey guys, I think I'm going to hit a 15" percent

return. SOUF ¶ 45. He did the same thing "the next day," yet again "promoting a 15 percent internal rate [of] return on an asset." SOUF ¶ 46.

Cardone continued to promise a 15% return—and even higher—throughout 2019 and 2020 on social media:

- In a YouTube video on April 22, 2019, Cardone stated "You're going to walk away with a 15% annualized return. If I'm in that deal for 10 years, you're gonna earn 150% on your money. You can tell the SEC that's what I said it would be. They call me Uncle G. And some people call me Nostradamus because I'm predicting the future, dude. This is what's going to happen." SOUF ¶ 48.
- On May 5, 2019, Cardone Capital advertised a "15% Targeted IRR," "monthly distributions," and "long-term appreciation" in "funds open for nonaccredited and accredited investors." SOUF ¶ 50.
- On September 17, 2019, Cardone advertised that a $220,000 investment yields a $660,000 "position," $12,000–$15,000/year in distributions, and (per related statements) a 5–7 year exit at $660,000 "plus cash flow." SOUF ¶ 52.
- On January 31, 2020, Cardone advertised "at least 2X-3X" returns on "investment." SOUF ¶ 57.
- On February 5, 2020, Cardone advertised that a $1,000,000 investment would grow to $2,180,000, yield $480,000 in six-year cash flow, "north of 15% returns after fees," and a "118% return amounting to 19.6% per year." SOUF ¶ 59.

In all these social-media posts, Cardone never informed prospective investors about the SEC's finding that he did not have a basis to project a 15% return. SOUF ¶¶ 49, 51, 53, 58, 60 (Cardone: "I did not share with any of our investors that the SEC sent us a letter filled with incorrect data. No, I didn't. And I did remove the 15 percent, despite the fact, Raj, that I thought our investors should know the 15. And the day after

removing it, I would then go back and tell my investors, by the way, we think it's going to get a 15 percent internal rate of return.”); SOUF ¶ 49 (“Q. “You never told any investors about the SEC's determination in this letter; right?” [Objection by Defendants’ counsel] A. “There’s a lot of things I don’t tell my investors, Raj. Lots. So many things, like it’s crazy.”).

D. Cardone Told Investors He Was Responsible for the Funds’ Debt

Cardone also made statements on social media about the assets and liabilities of the Funds. In one Instagram post, he told investors that he alone was responsible for the Funds’ debt:




SOUF ¶ 54. Cardone admitted in deposition, however, that he does not personally pay the debt-service payments for the properties owned by the Funds. SOUF ¶ 55. Cardone Capital’s Executive Vice President agreed. SOUF ¶ 55. Instead, the Funds use their operating income to service this debt, significantly reducing the returns investors would otherwise receive. SOUF ¶¶ 55–56.

E. Class Members Invest in Funds V and VI

According to Defendants’ SEC filings, Funds V and VI are “almost identical.” SOUF ¶ 8. Fund V raised $50 million and completed its fundraising in 2019; Fund VI

raised about $30 million and completed its fundraising in 2020. SOUF ¶¶ 40, 43. Cardone bragged on Instagram that Fund V was "the first Regulation A of its kind to raise $50 Million in crowdfunding using social media." SOUF ¶ 41.

Luis Pino, one of Cardone's social-media followers and Lead Plaintiff's father and predecessor-in-interest, invested in the Funds in 2019. SOUF ¶ 3. Other class members invested in Funds V and VI between 2018 and 2020. SOUF ¶¶ 40, 43.

## II. Procedural History

This case was filed in September 2020. Pino asserted that Cardone made material misrepresentations and omissions on social media in violation of Sections 12 and 15 of the Securities Act of 1933. The Court twice dismissed the complaint. The Ninth Circuit reversed those dismissals. *Pino v. Cardone Capital, LLC*, 139 F.4th 1102 (9th Cir. 2025) ("*Pino II*"); *Pino v. Cardone Capital, LLC*, 55 F.4th 1253 (9th Cir. 2022) ("*Pino I*") (published opinion resolving, in part, first appeal); *Pino v. Cardone Capital, LLC*, 2023 WL 2158802 (9th Cir. Feb. 22, 2023) (memorandum disposition resolving, in remaining part, first appeal).

In 2023, Luis Pino passed away. SOUF ¶ 2. The Court substituted his daughter and successor-in-interest, Christine Pino, as Lead Plaintiff. Dkt. No. 124.

On March 27, 2026, the Court certified the class and appointed Christine Pino as class representative. Dkt. No. 229. Defendants sought interlocutory review under Rule 23(f), and the Ninth Circuit denied their petition.

## III. Legal Standard

"Summary judgment is appropriate if—construing the facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor—there is no genuine dispute of material fact, such that judgment is appropriate as a matter of law." *Merrick v. Hilton Worldwide, Inc.*, 867 F.3d 1139, 1145 (9th Cir. 2017).

# Argument

An issuer is liable under Section 12(a)(2) of the Securities Act for offering or

selling securities using prospectuses or oral communications that contain material misstatements or omissions. 15 U.S.C. § 77l(a)(2). There are several requirements for liability under Section 12(a)(2). The issuer must (a) offer or sell a security, (b) by use of a means or instrumentality of interstate commerce, (c) by means of a prospectus or communication, and (d) "that includes an untrue statement of material fact or omits to state a material fact that is necessary to make the statements not misleading." *See Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 885 (9th Cir. 2008).

Section 12(a)(2) is "unique as 'a virtually absolute liability provision that does not require an allegation that defendants possessed scienter.'" *Pino II*, 139 F.4th at 1110 (quoting *Miller*, 519 F.3d at 886); *see also Pinter v. Dahl,* 486 U.S. 622, 646 (1988) (Section 12(a)(2) imposes "in terrorem" liability). Section 12(a)(2) also does not require a plaintiff to prove reliance. *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 578 (1995) (no "proof of . . . reliance" required).

**IV. Pino is Entitled to Summary Judgment on Her Omissions Theory**

Cardone's social-media statements projecting a 15% return and higher to investors violate the Securities Act because they do not inform investors of the SEC's finding that Cardone had no basis to project such returns. *See* SOUF ¶¶ 48–49 (April 22, 2019 YouTube video, projecting a 15% annualized return), 50–51 (May 5, 2019 Instagram post, projecting a 15% Targeted IRR), 52–53 (September 17, 2019 Instagram post, projecting 3X returns "plus cash flow"), 57–58 (January 31, 2020 Instagram post, projecting "at least 2X-3X returns"), 59–60 (February 5, 2020 Instagram post, projecting "north of 15% returns after fees" and "118% return amounting to 19.6% per year").

A. The *Omnicare* Framework

Cardone's projections about the 15% and higher returns investors would receive are statements of opinion. An opinion statement is untrue if (a) the issuer does not believe the statement and it is objectively false, or (b) it omits a material fact. *Pino II*, 139 F.4th at 1108–09, 1111. Under *Omnicare* prong (b), an opinion may be actionably

false if it "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." *Omnicare*, 575 U.S. at 189; *see also* *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 764 (9th Cir. 2023) ("A statement of opinion, even if literally accurate, may be rendered misleading by the omission of a material fact.").

B. No Facts Relevant to Omissions Liability Under *Omnicare Prong (b)* Remain in Dispute

**Undisputed Fact #1**: **After reviewing Cardone's track record, the SEC found Cardone did not have a basis to project a 15% IRR**. There is no dispute that Fund V's draft offering circular contained detailed financial disclosures about Cardone's prior investment performance. SOUF ¶¶ 26–30. These disclosures made clear, for example, that none of Cardone's prior equity funds—which the circular specifically identified as "similar in nature" to Fund V, as having "similar . . . investment objectives" to Fund V, and being "useful" benchmarks to evaluate Fund V—had achieved a 15% return. SOUF ¶¶ 27–30. There is no dispute that the SEC reviewed this information in Cardone's draft filing. SOUF ¶ 32 ("We have reviewed your offering statement and have the following comments."). And there is no dispute that, following this review, the SEC determined Cardone "d[id] not appear to have a basis" for representing a 15% return and directed Defendants to "[p]lease revise to remove this disclosure throughout the offering statement." SOUF ¶ 33.

**Undisputed Fact #2**: **Cardone projected 15% returns (and higher) *after* the SEC's comment letter**. There is likewise no dispute that after the SEC's comment letter, Cardone continued to project a 15% return. Cardone himself admitted that "within hours I was online telling people, guys, I think I can get a 15. And the reason I told them, despite the SEC's please revise, despite them saying please revise, within two hours I was telling my audience, hey, guys, I think I'm going to hit a 15. You know why? Because I think I'm going to hit a 15, man." SOUF ¶ 45.

Cardone continued to project 15% returns and higher on social media for months. He told investors: "You're going to walk away with a 15% annualized return. If I'm in that deal for 10 years, you're gonna earn 150% on your money." SOUF ¶ 48. In other posts, he projected a 15% IRR and "north of 15% returns after fees," and told investors they would triple their investments and more. SOUF ¶¶ 50, 52, 57, 59. There is no dispute that Cardone made these statements on his social-media accounts, which have millions of followers. *See, e.g.*, SOUF ¶¶ 13, 48 (Cardone admitting that he made this statement and "knew [he was] being recorded when [he] made those statements").

**Undisputed Fact #3**: **Cardone never disclosed the SEC's determination to class members**. There is no dispute that in these social-media statements, Cardone never disclosed the SEC's determination that Cardone lacked any basis to project a 15% return. The posts themselves say nothing about the SEC's finding. SOUF ¶¶ 49, 51, 53, 58, 60. And Cardone admitted his omissions in deposition. SOUF ¶ 49 (Cardone: "I did not share with any of our investors that the SEC sent us a letter filled with incorrect data. No, I didn't. And I did remove the 15 percent, despite the fact, Raj, that I thought our investors should know the 15. And the day after removing it, I would then go back and tell my investors, by the way, we think it's going to get a 15 percent internal rate of return.").

A. *Omnicare* is Directly on Point and Compels Liability

According to *Omnicare* itself, "if the issuer made the statement . . . with knowledge that the Federal Government was taking the opposite view, the investor again has cause to complain: He expects not just that the issuer believes the opinion . . . but that it fairly aligns with the information in the issuer's possession at the time." 575 U.S. at 188–89.

The Ninth Circuit cited this language from *Omnicare* to support its holding that Cardone's omission was objectively misleading "to a reasonable person reading the statements fairly and in context." *Pino*, 2023 WL 2158802, at *3 (citing *Omnicare*, 575 U.S. at 188–89). The Ninth Circuit also held that "Cardone's failure to disclose the SEC

letter (which requested that Cardone remove the projected rates of return and distributions) supports an omission claim." *Pino II*, 139 F.4th at 1111. The allegations at issue in these appeals relevant to omissions liability have now become undisputed facts. In *Atossa Genetics*, the Ninth Circuit likewise recognized omissions liability in such circumstances. *See In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 801–02 (9th Cir. 2017) (recognizing *Omnicare* omissions liability where drug manufacturer gave impression that FDA had granted drug clearance when, in fact, the FDA was raising concerns about the drug).

The context of Cardone's statements confirms the application of omissions liability. *See Omnicare*, 575 U.S. at 190 ("[W]hether an omission makes an expression of opinion misleading always depends on context."). The Ninth Circuit previously held that a "reasonable person" would be misled by Cardone's omissions given their "context." *Pino*, 2023 WL 2158802, at *3. This remains true—based on now-undisputed facts. Cardone told investors that he was predicting the future and that a 15% return was "going to happen." *See, e.g.*, SOUF ¶ 48. When a speaker *guarantees* returns and claims to be Nostradamus, SOUF ¶ 48, an investor reasonably understands the speaker does not know materially conflicting facts. *See Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 176–77 (2d Cir. 2020) ("authority with which" statement was made implied issuer knew no facts cutting the other way). Cardone told investors specific returns and distributions (e.g., 15%) over a specific time period. He even did the math for them, SOUF ¶ 52 (Ex. 21), suggesting misleadingly these were not merely casual estimates:




Cardone also held himself out as having special knowledge of the facts, naturally unknown to prospective investors, further confirming *Omnicare* liability. Omnicare, 575 U.S. at 191–92; *accord* Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1091 (1991) ("Shareholders know that directors usually have knowledge and expertness far exceeding the normal investor's resources . . . ."). Indeed, that's Cardone's sales pitch—he's an expert who knows better than anyone how to make money in real estate. Cardone continued to tout his purported "special knowledge" in deposition: "I'm a genius at real estate. God gives everybody something. God gave me this gift." SOUF ¶ 18 ("I've been studying real estate since I was 28 years old, man . . . without arrogance, I am a master at the game.").

C. Cardone's Omission is Material

Particularly when a self-professed "genius" and "master" at real estate says he will obtain a specific return based on specific calculations, a reasonable investor would

find it material that the Federal Government had, in fact, taken the opposite view. Materiality can be resolved on summary judgment if the omissions are "so obviously important to an investor, that reasonable minds cannot differ on the question." S*ee* *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976).

The materiality of omitting the SEC's finding is proven as a matter of law because the Federal Government's view—Cardone has no basis to project a 15% return—is directly contrary to Cardone's statements that investors are guaranteed 15% returns. That follows from *Omnicare* and Ninth Circuit cases like *Atossa Genetics*—and is even stronger here because the opposite view comes from the agency responsible for the subject matter (the SEC here, like the FDA in *Atossa Genetics*). The SEC has significant subject matter expertise in regulating the statements that can be made in securities offerings; its determination that Cardone's projected returns lacked a factual basis upended investors' expectations that his statements "fairly align[ed] with the information in [his] possession at the time," *Omnicare*, 575 U.S. at 189.

This omission is without dispute material as to Cardone's April 22 post on YouTube, in which he invoked the SEC by name. "You're going to walk away with a 15% annualized return . . . **You can tell the SEC that's what I said it would be**." SOUF ¶ 48 (emphasis added). When expressly mentioning the SEC in connection with his 15% projection, a reasonable investor would consider it material that, in fact, Cardone had himself previously told the SEC that's "what it would be" and the SEC, in fact, without dispute, determined Cardone had no basis to make such a claim.

D. All Other Requirements for Liability Are Met

The other requirements for Section 12(a)(2) liability are, on this undisputed record, satisfied. Defendants sold Pino a security by means of a prospectus and used oral communications to solicit investors. *See, e.g.*, SOUF ¶¶ 44–46, 48. As discussed below, *infra* Section V, it is undisputed that Defendants are sellers under the meaning of the Act. And the interstate commerce requirement is readily met: Pino was a resident of California; Cardone Capital and the Funds are organized in Delaware and

headquartered in Florida; and the Funds purchased interests in properties across three states. SOUF ¶¶ 1, 5–7.

In deposition, Cardone defended himself by claiming that the SEC got it "wrong," "made a mistake," and just "didn't know what they were doing." SOUF ¶ 34. This attack on the SEC does not create any disputed facts. Cardone has no evidence that the SEC doesn't understand the securities laws, which Congress has tasked the agency with regulating for almost a century. The undisputed evidence establishes that the SEC reviewed Fund V's draft offering circular, which contained detailed disclosures about Cardone's investing track record. SOUF ¶¶ 26–30. Cardone also had an opportunity at the time to correct the record if he believed the SEC got it wrong—but did not. SOUF ¶¶ 37–38.

In any event, Cardone's subjective belief that the Government was wrong has nothing to do with omissions liability under *Omnicare* prong (b). Cardone was obligated to disclose that the Federal Government was taking the opposite view even if he disagreed. A subjective disagreement does not obviate the objective requirement to disclose the truth to investors. For example, the defendant in *Perrigo* likewise disagreed with the Irish Government's tax finding (and unlike Cardone, even "intend[ed] to contest it,") but the court found that as a matter of law on summary judgment, the defendant "had a duty" to disclose the Government's opposite view "even if it 'disagreed'" with the "position." *In re Perrigo Co. PLC Sec. Litig.*, 2021 WL 3005657, at **3, 6 (S.D.N.Y. July 15, 2021); *see also SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1094 (9th Cir. 2010) ("a defendant ordinarily will not be able to defeat summary judgment by the mere denial of subjective knowledge of the risk that a statement could be misleading"). Cardone also claimed in deposition that the SEC's comment letter was merely a suggestion—not a request with which he had to comply. Here too, Cardone's subjective interpretation of the comment letter does not obviate his duty to disclose it.

* * *

The statutory backdrop of the Securities Act further confirms Defendants' liability as a matter of law. The "primary purpose" of the Securities Act is "to protect investors by requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offerings of securities in interstate commerce." *Pinter*, 486 U.S. at 638. Sellers know leaps and bounds more about an offering than buyers; to equalize this information asymmetry, sellers have a duty to disclose material information. *Id.* In the Securities Act, Congress specifically recognized the inequality of bargaining power between professional issuers and the average investor, departed from the common law rule of caveat emptor to one requiring "the seller also beware," and put the "burden of disproving responsibility for reprehensible acts of omission or commission" on the seller. *See* H. Rep. No. 85, 73d Cong., 1st Sess. (1933), pp. 2–10; *see also* S. Rep. No. 47, 73d Cong., 1st Sess. (1933), pp. 6–7.

In sum, the undisputed record compels omissions liability based on *Omnicare* prong (b), the Ninth Circuit's two opinions addressing these exact issues, and the history and purpose of the Securities Act.

**V. There is No Dispute that Defendants Are Statutory Sellers**

Section 12(a)(2) of the Securities Act imposes liability on "any person who *offers or sells* a security . . . by means of a prospectus or oral communication" containing a material misstatement or omission. 15 U.S.C. § 77l(a)(2) (emphasis added). There is no question that Funds V and VI directly sold a security to Pino and the class members. SOUF ¶ 44. Nor is there any material dispute about the fact that Cardone and Cardone Capital are sellers, because a person qualifies as a statutory seller not just by passing title but also by "successfully solicit[ing] the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter*, 486 U.S. at 647. In *Pino I*, the Ninth Circuit held that Defendants' social-media posts satisfy this element, explaining that "a person can solicit a purchase, within the meaning of the

Securities Act, by promoting the sale of a security in a mass communication," including social-media posts and online videos. 55 F.4th at 1260.

Here too, what were once allegations are now undisputed facts. Grant Cardone and Cardone Capital posted the social-media solicitations which the Ninth Circuit analyzed and found sufficient to satisfy the statutory-seller requirement in *Pino I*. And "both Cardone and Cardone Capital had a financial interest in the sale of the securities," *Pino I*, 55 F.4th at 1260, because Cardone Capital is entitled to 35% of the Funds' profits and distributions, and Cardone Capital is in turn "absolutely" controlled by Cardone. SOUF ¶¶ 9, 12.

The Court should find, based on this undisputed record, that Defendants satisfy the requirements for Defendants to be statutory sellers under Section 12(a)(2). Even if the Court does not grant complete summary judgment (and it should, for the reasons described in the prior section), then a summary judgment ruling on the "seller" requirement of Section 12(a)(2) will simplify and shorten the trial.

## VI. There is No Dispute That Cardone Does Not Personally Pay the Funds' Debt

The Court should grant partial summary judgment on another element of Pino's Section 12(a)(2) claim—falsity—as to Cardone's October 31, 2019 statement that he was "responsible" for the Funds' debt. SOUF ¶ 54. *Omnicare* does not govern the falsity of this statement. That is because who is "responsible" for the debt is a historical fact question about the nature of the Funds, not an opinion. *See Omnicare*, 575 U.S. at 183 (fact is a "thing done or existing" or "an actual happening" (cleaned up)).

No material facts are in dispute as to this statement's falsity, because Cardone admitted in deposition that the Funds' operating income—the money they derive from charging tenants rent—is used to pay debt-service payments:

**Q**: You're paying the debt down using the fund's operating income; right?

**A**: That's right.

SOUF ¶ 55. Cardone Capital's Executive Vice President, Ryan Tseko, agreed Cardone

"does not personally pay the debt service on any Fund V or Fund VI property." SOUF ¶ 55. On this undisputed record, Cardone is not "responsible" for the Funds' debt—this was an untrue statement.

Not only did Cardone admit this statement's falsity, but he also admitted that his abdication of "responsibility" devastates investors' returns. Testifying as Cardone Capital's corporate representative, Cardone explained in deposition: "We collect the rents, the rents pay the debt. We collect the rents, the rents pay the utility bills. We collect the rents, we pay the property taxes. We collect the rents, whatever is left over gets distributed to our investors." SOUF ¶ 56. If it were true that Cardone actually paid the debt, as he falsely told investors he would, then there would be significantly more "left over [to] get[] distributed to [the] investors." SOUF ¶ 56. The Ninth Circuit recognized this too: "there would be fewer costs for investors and thus greater returns if Cardone were responsible for the debt." *Pino II*, 139 F.4th at 1112. But because the Funds use "the rents [to] pay the debt," SOUF ¶ 56, directly contrary to Cardone's October 31, 2019 statement, the returns investors receive are significantly lower than promised.

Cardone's October 2019 statement is, based on undisputed facts, false.

## VII. Because Defendants Are Liable Under Section 12(a)(2), Class Members Are Entitled to Rescind Their Investments

Because Defendants are liable under Section 12(a)(2), every class member is entitled to receive Section 12(a)(2)'s statutory remedy: rescission. As the Court has recognized, "[r]escission, the remedy available to class members who still hold investments in the Funds, is formulaic and can be calculated applying a common method." Dkt. No. 229 at 10. Class members can elect to recover "the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." 15 U.S.C. § 77l(a). Pino has proffered expert testimony about the rescissory calculation, and her expert stands ready to calculate each class member's rescissory

damages.[2]

In addition, the Court has discretion to determine the applicable rate of interest, and the Court should order compound interest at a rate of 7% for each class member since the date of their investment. In federal securities cases, district courts "consider a number of factors in awarding prejudgment interest, including whether prejudgment interest is necessary to compensate the plaintiff fully for his injuries, the degree of personal wrongdoing on the part of the defendant, the availability of alternative investment opportunities to the plaintiff, whether the plaintiff delayed in bringing or prosecuting the action, and other fundamental considerations of fairness." *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 176 (1989). Here, each factor weighs in favor of awarding compound interest at a rate exceeding the Federal Funds rate. Doing so is needed to compensate class members for Defendants' omission, for which they are highly culpable. Cardone knew about the SEC's finding but purposefully chose not to disclose it to the Class. And there was no delay in bringing this case, which was filed just months after Fund VI completed its offering. There were also many alternative investment opportunities available to class members, including mutual funds keyed to the U.S. stock market, which have greatly exceeded the Federal Funds rate in recent years. Compounding is also appropriate; returns in alternative investments—and even in a savings account—would have compounded over the past years. *See generally* *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 173 (Del. 2002) ("The rule or practice of awarding simple interest, in this day and age, has nothing to commend it—except that it has always been done that way in the past." (cleaned up)).

Courts in securities cases have also looked to the law of the forum state to identify

---

[2] Defendants are required before trial to produce up-to-date data about how much each class member has received in distributions. If a class member sold his investment in the Funds, he is entitled to the value of his investment, minus distributions, plus interest, and minus the sales price. Plaintiff's expert will likewise calculate this remedy for any such class member, of which there are few and possibly none (most if not all class members continue to hold their investments).

the appropriate rate of interest. *See, e.g.*, *In re Livent, Inc.*, 360 F. Supp. 2d 568, 570–73 (S.D.N.Y. 2005) (exercising discretion to award a 9% prejudgment interest rate in federal securities law case and looking to New York law to determine applicable prejudgment interest). The Court should follow their lead and rely on California's general requirement of 7% prejudgment interest.[3] Given the undisputed record here, this rate is appropriate and should be applied to class members' investments.

## VIII. There Is No Dispute Grant Cardone and Cardone Capital, LLC Are Control Persons Under Section 15

There remains no genuine dispute of material fact that Grant Cardone and Cardone Capital, LLC are control persons under Section 15 of the Securities Act. Section 15 imposes joint and several liability on every person who "controls any person liable" under Sections 11 or 12 of the Act. 15 U.S.C. § 77o(a); *see also* *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010). To prevail under Section 15, therefore, "a plaintiff must show that: (1) there is a primary violation of the Securities Act; and (2) the defendant directly or indirectly controlled the person or entity liable for the primary violation." *Pino I*, 55 F.4th at 1257. There is a primary violation here for the reasons described above. But no matter whether the Court grants summary judgment on the primary violation, the Court should separately grant summary judgment on Section 15's requirement that Grant Cardone and Cardone Capital control Funds V and VI.

The facts are undisputed and unequivocal. Grant Cardone, testifying on behalf of Cardone Capital, admitted that he maintains "absolute and total" control over Cardone Capital and the Funds. SOUF ¶ 11; *see also* SOUF ¶¶ 10, 12. The Funds' offering documents confirm that Cardone Capital makes all operating decisions, and Grant Cardone is the controller and "sole decision maker" of Cardone Capital. SOUF ¶¶ 10–

---

[3] Although California law typically provides for simple interest, compound interest is appropriate here for the reasons explained above.

12.

There is no dispute Grant Cardone and Cardone Capital control both Funds V and VI, and therefore are jointly and severally liable for any primary violation of Section 12. The Court should grant summary judgment on the control requirement of Section 15—so if either the Court or jury finds a violation of Section 12(a)(2), Cardone and Cardone Capital will face joint and several liability under Section 15.

**Conclusion**

For the reasons stated above, the Court should grant summary judgment on Plaintiff's Sections 12(a)(2) and 15 claims.

Respectfully Submitted,

Dated: October 19, 2026

MARC M. SELTZER
STEVEN G. SKLAVER
KRYSTA KAUBLE PACHMAN
RAJ MATHUR
MORGAN MCCOLLUM
SUSMAN GODFREY L.L.P.

By *\/s/ Marc M. Seltzer*
Marc M. Seltzer
Attorney for Lead Plaintiff and the Class

## Certificate of Compliance

The undersigned, counsel of record for Plaintiff, certifies that this brief is less than 25 pages, which complies with the page limit in the Court's Standing Order.

Dated: October 19, 2026

RAJ MATHUR
SUSMAN GODFREY L.L.P.

By *\/s/ Raj Mathur*
Raj Mathur
Attorney for Lead Plaintiff and the Class

## Certification Regarding AI Use

The undersigned, counsel of record for Plaintiff, certifies that AI was used only to assist in cite-checking this document and identify any potential typographical errors. I certify that I have personally reviewed and verified the accuracy of all legal citations, quotations, factual statements, and analyses contained in this document.

Dated: October 19, 2026

RAJ MATHUR
SUSMAN GODFREY L.L.P.

By *\/s/ Raj Mathur*
Raj Mathur
Attorney for Lead Plaintiff and the Class