JOSEPH N. AKROTIRIANAKIS (SBN 197971)
*jakro@kslaw.com*
LISA BUGNI (SBN 323962)
*lbugni@kslaw.com*
MATTHEW V.H. NOLLER (SBN 325180)
*mnoller@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310

BRANDON R. KEEL (*pro hac vice*)
*bkeel@kslaw.com*
CHERI A. GROSVENOR (*pro hac vice*)
*cgrosvenor@kslaw.com*
KING & SPALDING LLP
1180 Peachtree Street N.E., Suite 1600
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100

Attorneys for Defendants
CARDONE CAPITAL, LLC, GRANT CARDONE, CARDONE EQUITY FUND V, LLC, and CARDONE EQUITY FUND VI, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| CHRISTINE PINO, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>CARDONE CAPITAL, LLC, GRANT CARDONE, CARDONE EQUITY FUND V, LLC, and CARDONE EQUITY FUND VI, LLC,<br><br>Defendants. | Case No. 2:20-cv-08499-JFW (KS)<br><br>**CLASS ACTION**<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>**Ctrm:** 580<br>**Judge:** Hon. John F. Walter<br>**Mag. Judge:** Hon. Karen L. Stevenson<br><br>**Motion Hearing Date**: 12/07/2026<br>**Discovery Cutoff Date:** 11/16/2026<br>**Pretrial Conference Date:** 2/12/2027<br>**Trial Date:** 3/9/2027<br>**Complaint Filed:** 9/16/2020 |

## TABLE OF CONTENTS

I. INTRODUCTION ........ 1

II. BACKGROUND ........ 3

A. Cardone Capital's Successful Track Record ........ 3

B. The Funds' Offering Process ........ 4

C. Property Selection, Management, and "Hold and Exit" Strategy ........ 6

D. The Funds' Performance ........ 7

E. Procedural Background ........ 7

III. ARGUMENT ........ 8

A. Plaintiff Cannot Prove Loss. ........ 9

B. Plaintiff Cannot Prove Material Falsity. ........ 13

1. Defendants' targets were not materially false or misleading. ........ 13

2. The challenged statement regarding the Funds' debt obligations was not materially false or misleading. ........ 21

C. Plaintiff's Section 15 Claim Fails as a Matter of Law, but at a Minimum There are Genuine Factual Disputes ........ 23

D. Plaintiff's Failure to Prove Her Claims Moots the Rest of Her Motion. ........ 24

IV. CONCLUSION ........ 25

# TABLE OF AUTHORITIES

Page(s)

## Cases

*In re Adobe Sys., Inc. Sec. Litig.*,
787 F. Supp. 912 (N.D. Cal. 1992) .......... 15

*Alexander v. Cahill*,
598 F.3d 79 (2d Cir. 2010) .......... 19

*In re Amarin Corp. PLC Sec. Litig.*,
2022 WL 2128560 (3d Cir. June 14, 2022) .......... 16, 17

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
381 F. Supp. 2d 192 (S.D.N.Y. 2004) .......... 9, 11

*In re Atossa Genetics Inc. Sec. Litig.*,
868 F.3d 784 (9th Cir. 2017) .......... 18, 19

*Barker v. Nextracker Inc.*,
827 F. Supp. 3d 1214 (N.D. Cal. 2026) .......... 16

*In re Broderbund/Learning Co. Sec. Litig.*,
294 F.3d 1201 (9th Cir. 2002) .......... 9

*Casella v. Webb*,
883 F.2d 805 (9th Cir. 1989) .......... 9, 10

*Com. Union Assur. Co., plc v. Milken*,
17 F.3d 608 (2d Cir. 1994) .......... 11

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) .......... 9, 10

*In re Dynavax Sec. Litig.*,
2018 WL 2554472 (N.D. Cal. June 4, 2018) .......... 16, 18

*In re Finjan Holdings, Inc.*,
58 F.4th 1048 (9th Cir. 2023) .......... 13

*Golub v. Gigamon Inc.*,
847 F. App'x 368 (9th Cir. 2021) .......... 20, 21

*Grosz-Salomon v. Paul Revere Life Ins. Co.*,
237 F.3d 1154 (9th Cir. 2001) .......... 25

*Ho v. City of Long Beach, Public Works,*
2022 WL 17682677 (C.D. Cal. Oct. 24, 2022) .......... 19

*Homyk v. ChemoCentryx, Inc.*,
2025 WL 4110430 (N.D. Cal. Aug. 15, 2025) .......... *passim*

*Javaheri v. JPMorgan Chase Bank N.A.,*
561 F. App'x 611 (9th Cir. 2014) .......... 12

*In re Juniper Networks, Inc. Sec. Litig.,*
542 F. Supp. 2d 1037 (N.D. Cal. 2008) .......... 24

*Koehler v. Pulvers,*
614 F. Supp. 829 (S.D. Cal. 1985) .......... 25

*In re LifeLock, Inc. Sec. Litig.,*
690 F. App'x 947 (9th Cir. 2017) .......... 20

*Merzin v. Provident Fin. Grp., Inc.,*
311 F. Supp. 2d 674 (S.D. Ohio 2004) .......... 10, 12

*Miles-Hickman v. David Powers Homes, Inc.,*
2009 WL 1797872 (S.D. Tex. June 24, 2009) .......... 25

*N.J. Carpenters Health Fund v. Rali Series 2006-QO1 Trust*,
477 F. App'x 809 (2d Cir. 2012) .......... 23

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) .......... *passim*

*Ong ex rel. Ong v. Sears, Roebuck & Co.*,
2005 WL 2284285 (N.D. Ill. Sept. 14, 2005) .......... 10

*Pardi v. Tricida, Inc.*,
2024 WL 1056013 (N.D. Cal. Mar. 11, 2024) .......... 16, 18

*In re Perrigo Co. PLC Sec. Litig.,*
2021 WL 3005657 (S.D.N.Y. July 15, 2021) .......... 19

*Pino v. Cardone Capital, LLC* (*Pino I*),
2023 WL 2158802 (9th Cir. Feb. 22, 2023) .......... 8, 14

*Pino v. Cardone Capital, LLC* (*Pino II*),
139 F.4th 1102 (9th Cir. 2025) .......... 8, 18, 20

*Prager Univ. v. Google LLC*,
951 F.3d 991 (9th Cir. 2020) .......... 19

*R & A Synergy LLC v. Spanx Inc.*,
2019 WL 4390564 (C.D. Cal. May 1, 2019) .......... 19

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*,
845 F.3d 1268 (9th Cir. 2017) .......... 22

*Rubke v. Capitol Bancorp Ltd.*,
551 F.3d 1156 (9th Cir. 2009) .......... 20

*In re Sanofi Sec. Litig.*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015) .......... 16

*SEC v. Interlink Data Network of L.A., Inc.*,
1993 WL 603274 (C.D. Cal. Nov. 15, 1993) .......... 25

*SEC v. Pattison*,
2011 WL 723600 (N.D. Cal. Feb. 23, 2011) .......... 25

*SEC v. Platforms Wireless Int'l Corp.*,
617 F.3d 1072 (9th Cir. 2010) .......... 19

*Siemers v. Wells Fargo & Co.*,
2007 WL 1456047 (N.D. Cal. May 17, 2007) .......... 10, 12

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .......... 11

*Strezsak v. Ardelyx Inc.*,
2024 WL 1160900 (N.D. Cal. Mar. 18, 2024) .......... *passim*

*TC Rich, LLC v. Shaikh*,
2021 WL 1254359 (C.D. Cal. Feb. 22, 2021) .......... 12

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016) .......... *passim*

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 9, 11

*Twigg v. AbbVie Inc.*,
265 N.E.3d 955 (Ill. App. Ct. 2025) .......... 10, 12

*Weinberger v. Jackson*,
1990 WL 260676 (N.D. Cal. Oct. 11, 1990) .......... 15, 16

*Ylitalo v. Automatic Data Processing, Inc.*,
2026 WL 674423 (D.N.J. Mar. 10, 2026) .......... 9, 10, 11

**Statutes and Rules**

15 U.S.C. § 77*l*(a)(2) .......... *passim*

15 U.S.C. § 77*o* .......... 10, 25

Fed. R. Civ. P. 56(a) .......... 10

**Other Authorities**

5D Arnold S. Jacobs, Disclosure & Remedies Under the Sec. Laws § 3:217 .......... 25

## I. INTRODUCTION

The Court should not only deny Plaintiff's motion for summary judgment, it should grant summary judgment to Defendants because it is *Defendants*, not Plaintiff, who are entitled to judgment as a matter of law. As explained in Defendants' motion, they are entitled to summary judgment because Plaintiff must, but cannot, prove that she or any other class member has suffered any loss on their investments in Cardone Equity Funds V and VI. It is undisputed that the Funds' present values exceed the amount class members invested, meaning their investments have appreciated in value and they have suffered no loss. Plaintiff's conceded inability to prove loss forecloses her claims under both Article III of the U.S. Constitution and Section 12(a)(2) of the Securities Act of 1933, requiring summary judgment on that basis alone.

Defendants are also entitled to summary judgment because Plaintiff cannot prove that Defendants made any materially false or misleading statement of fact in violation of the Securities Act. Arguing otherwise, Plaintiff seeks summary judgment on two theories of falsity: (1) that Defendants misleadingly failed to disclose an SEC letter asking Fund V to remove from its preliminary Offering Circular statements that the Fund would target a 15% internal rate of return ("IRR"), and (2) that an Instagram post falsely represented that Grant Cardone would personally make debt servicing payments for properties in the Funds. Each theory fails as a matter of law.

With respect to the SEC letter, Defendants did disclose the content of that letter in Fund V's publicly disclosed response, which was easily available to any investor. But even if Defendants had not disclosed the letter, they had no obligation to do so—and Plaintiff mischaracterizes the letter in trying to show the contrary. Despite what Plaintiff claims, the SEC letter reflects no finding that Mr. Cardone or Cardone Capital lacked a reasonable basis for targeting a 15% IRR. The letter on its face shows it was directed to Fund V itself and merely requested removal of the target given that Fund V had "limited operations" and had made no distributions to investors at that time. That was true as to Fund V, which was just being launched, owned no property,

and had no operations. But it was not true of Mr. Cardone or Cardone Capital: their 15% IRR target was both honestly held and objectively reasonable, supported by internal analyses and their long track record of success in real-estate investing. Moreover, even if the SEC letter reflected disagreement with the 15% target, which it did not, the law is clear (and undisputed by Plaintiff) that where, as here, an issuer has a reasonable basis for its opinions about targets or projections, it has no obligation to disclose the mere fact that the government disagrees with the issuer's opinions.

With respect to the other challenged statement—"One question you might want to ask is, who is responsible for the debt? The answer is Grant!"—no reasonable investor could have interpreted it (or did interpret it) as representing that Mr. Cardone would personally pay the service on debt used to acquire properties for the Funds, rather than income from the properties that secured that very debt. The Funds' Offering Circulars, in fact, indisputably disclosed that income from the properties would be used to pay the debt before distributions to investors. Plaintiff admits that any investor who read those disclosures would have understood how the Funds' debts would be paid, and every investor attested in writing that they *did* read and understand those disclosures before investing. All investors in the Funds signed Subscription Agreements representing (among other things) that they understood the investments' risks, had read and understood the Offering Circulars, and were not relying on any external statements by Defendants. What the Instagram statement actually represented—that investors would not be responsible for the debt—was true: investors in the Funds were not personally responsible for the debt, whereas Mr. Cardone *did* personally guarantee the debt whenever a lender required a guaranty and was responsible for securing the debt to acquire the properties in the first place.

For these reasons, Defendants are entitled to summary judgment on Plaintiff's claims. But even if that were not true, Plaintiff still would not be entitled to summary judgment because there would be, at a minimum, material factual disputes as to essential elements of her claims. The Court should therefore grant Defendants'

motion for summary judgment; but if it does not, it should deny Plaintiff's motion.

## II. BACKGROUND

### A. Cardone Capital's Successful Track Record

Grant Cardone is a real-estate entrepreneur with decades of experience managing real-estate assets. (Defendants' Statement of Genuine Disputes of Material Fact ("SOF") ¶ 69.) He founded Cardone Capital, which currently manages over $5 billion in assets, to provide "everyday" investors access to institutional-grade real estate deals typically reserved for the wealthy. (*Id.* ¶¶ 14, 70–71.) One such opportunity Cardone Capital has offered investors is the chance to purchase securities issued by funds that then use the money to acquire large multifamily properties. (*Id.* ¶¶ 4, 71; *see also id.* ¶ 7.) In exchange for their investments, investors receive (1) regular cash returns from the income generated by the properties, and (2) proceeds from the eventual sale of the properties at appreciated values. (*Id.* ¶ 72.)

Funds V and VI are that type of investment vehicle. Before launching these Funds, Mr. Cardone and Cardone Capital already had a lengthy track record of success in the multifamily real-estate industry. (*Id.* ¶¶ 73–81.) By that time, Mr. Cardone had purchased over 40 multifamily properties comprising over 4,500 units, with a total purchase price exceeding $650 million. (*Id.* ¶ 73.) Of those properties, Mr. Cardone had sold over 20 by the time Funds V and VI were finalized. They were sold at appreciated values, often at a significant premium, even when holding the properties for a shorter duration than anticipated for Funds V and VI. (*Id.* ¶¶ 74–75.)

In addition, Cardone Capital had previously raised money through three Regulation D offerings—Cardone Equity Funds I, II, and III—which raised a total of $58,130,000 from 192 investors. (*Id.* ¶ 76.) The operating results of those three funds, which were included in the Offering Circulars for Funds V and VI, demonstrated positive cash flows and sizable distributions to investors. For example, Cardone Equity Fund I paid $123.73 per $1,000 invested in 2017 (12.3% annual cash return), and Cardone Equity Fund II paid $114.33 per $1,000 invested in 2017 (11.4% annual cash

return). (*Id.* ¶¶ 77–78.) As of June 30, 2018, Cardone Capital's projected IRRs for Funds I, II, and III were 27.2%, 26.5%, and 14.5%, respectively, and for the remainder of its investment portfolio the average projected IRR was 31.9%. (*Id.* ¶¶ 79–80.)

**B. The Funds' Offering Process**

Seeking to continue the success of its prior funds, Cardone Capital formed Funds V and VI in 2018, again offering investors an opportunity to invest in the multifamily real-estate market by purchasing securities for as little as $5,000, rather than having to buy an actual property for millions. (*Id.* ¶¶ 3, 82.) The Funds were designed as long-term investments with plans to hold the acquired properties for approximately ten years or longer. (*Id.* ¶ 85.) That way, the Funds would not be required to sell if the market had a downturn and could continue to hold until the optimal selling time. (*Id.* ¶¶ 85, 93.)

Fund V raised approximately $50 million from over 2,200 investors between December 2018 and September 2019, when the Fund closed. (*Id.* ¶ 40.) Fund V currently holds interests in five income-producing multifamily properties in Florida and Texas. (*Id.* ¶ 7.) Fund VI raised approximately $29 million from over 1,300 investors between October 2019 and the Fund's closing in June 2020. (*Id.* ¶ 43.) Fund VI currently holds interests in four income-producing multifamily properties in Florida and Maryland. (*Id.* ¶ 7.)

Both Funds made offerings under Regulation A of the Securities Act. (*Id.* ¶ 83.) Under Regulation A, an issuer need not comply with the Securities Act's registration requirements but must instead file an offering statement with the SEC. The issuer can sell securities once the SEC qualifies that statement. (*Id.* ¶ 84.) Consistent with this process, the Funds filed preliminary Offering Circulars with the SEC. One preliminary Offering Circular for Fund V said the Fund would "attempt to achieve an overall Company internal rate of return (IRR) of fifteen (15%) percent per year." (*Id.* ¶ 94.) IRR, a financial metric commonly used in the real estate industry,

is based on the combination of the annual amount investors receive in cash distributions and the appreciation in fair market value of held properties. (*Id.* ¶ 95.) Cardone Capital and Mr. Cardone also made similar statements concerning the targeted 15% IRR on social media. (*Id.* ¶ 104.)

In July 2018, the SEC issued a comment letter for Fund V, which asked Fund V to remove the 15% IRR target from the Offering Circular given Fund V's "limited operations." (*Id.* ¶ 98.) The SEC did not investigate or make any "finding" regarding the reasonableness of the target itself, which Mr. Cardone and Cardone Capital had based on a track record spanning decades. (*Id.* ¶¶ 96–97, 99.) After receiving the letter, Cardone Capital's CFO met with the SEC and, during that telephonic meeting, the SEC representative made clear that the request to remove the 15% IRR target was based on Fund V itself having limited operations, as the letter states, and not yet owning any properties or other assets (i.e., a "blind pool" investment) at that time. (*Id.* ¶ 100.) It was true that Fund V had "limited operations" at that time—the Fund just having been launched—but Mr. Cardone and Cardone Capital in fact had an established track record across many years of investing. (*Id.* ¶¶ 69, 73–81, 102.) Nonetheless, Fund V agreed to the SEC's request to remove the IRR target from the Offering Circular. (*Id.* ¶¶ 36, 101–102.) Both communications—the SEC's comment letter and Fund V's response—were publicly available on the SEC's EDGAR database before either Fund closed. (*Id.* ¶ 103.)

The Offering Circular for Fund V became final in December 2018, and the Offering Circular for Fund VI became final in September 2019, after each was qualified by the SEC. (*Id.* ¶¶ 39, 42.) The circulars explained how the Funds would work, including that the properties could be acquired with a combination of debt and equity and that the properties' debts would be paid using the properties' income. (*Id.* ¶¶ 108, 139–141.) The circulars also warned of the investments' risks, including that there was no guarantee of any return. (*Id.* ¶¶ 106–107.) Plaintiff has agreed that any investor who reviewed these disclosures would have understood them. (*Id.* ¶ 109.)

Indeed, every investor in the Funds executed a Subscription Agreement in which the investor represented that they had read and understood the Offering Circular and its disclaimers. (*Id.* ¶¶ 110, 112.) Investors represented, for example, that they or their advisors had "read and evaluated . . . all of the documents furnished or made available by the Issuer to the [investor], including the Offering Circular, as well as the merits and risks of such an investment." (*Id.* ¶ 112.) Investors agreed that the investments "involve[] a high degree of risk" and that every investor "could suffer the loss of his, her, or its entire investment." (*Id.* ¶ 111; *see also id.* ¶ 113 (agreeing that the investor was "financially able to bear the economic risk of this investment, including . . . a complete loss of this investment").) And investors agreed that "the attainment of any such projections, estimates or forward-looking statements cannot be guaranteed" (*Id.* ¶ 114), that "no representations or warranties have been made to the [investor] by the Issuer," and that the investor was "not relying on any information other than that contained in the Offering Documents and the results of independent investigation by the [investor]" (*Id.* ¶ 115).

### C. Property Selection, Management, and "Hold and Exit" Strategy

As was also explained in the Offering Circulars, the investment strategy for Funds V and VI was built upon a disciplined, criteria-driven property-selection process. Defendants targeted Class A and B multifamily properties expected to appreciate over the holding period, selecting properties based on positive cash flow at purchase, superior locations, and a purchase price below replacement cost, among other considerations. (*Id.* ¶ 88.) Defendants' strategy was to seek opportunities for the Funds that met rigorous financial criteria, including specific return metrics and high occupancy rates that were expected to allow the Funds to achieve the targeted returns of approximately 15% IRR and 5% annual cash distributions. (*Id.* ¶¶ 92, 94, 96, 104.)

Another part of the investment strategy was to improve the properties' values post-acquisition, with Cardone Capital serving as the Funds' manager and hiring reputable third-party property-management companies. (*Id.* ¶ 89.) These companies

were hired to improve efficiencies, address maintenance when necessary, deploy strategic capital upgrades, and where appropriate increase rents to increase overall value. Defendants also employed a rigorous underwriting process including due diligence, market valuation studies, and total-return analyses. (*Id.* ¶¶ 90–91.)

The lifecycle of the Funds was projected at a minimum of seven to ten years, at which time the Funds would sell or refinance properties that had appreciated in value. The Offering Circulars disclosed that multiple exit strategies were expected to be available to the Funds' manager, including refinancing or selling to third parties or a public real-estate investment trust, depending on market conditions at the time. (*Id.* ¶¶ 85, 93.) This strategy allows for flexibility to achieve targeted returns by timing market developments, thus positioning the Funds to sell properties at opportune times. (*Id.* ¶¶ 85, 93.)

**D. The Funds' Performance**

The targeted returns for Funds V and VI, which are the focus of this case, were not only supported by Mr. Cardone and Cardone Capital's track record of success, but they also have been validated by the actual performance of the Funds to date. The Funds have provided monthly cash distributions in line with projections and the market values of the properties indicate that investors will ultimately receive overall returns in line with the targeted 15% IRR. (*Id.* ¶¶ 116–125.) For example, as of September 2026, Funds V and VI have provided investors average annualized cash distributions of 5.9% and 4.6%, respectively. (*Id.* ¶¶ 117–118.) The Funds also have achieved double-digit IRRs based on the cash flows to date and current market values of the held properties. (*Id.* ¶¶ 124–125.) The Funds' independent auditor confirmed that the IRRs in the Funds' audited financial statements were "fairly presented" and that the underlying assumptions, including cap rates, were "reasonable." (*Id.* ¶ 127.)

**E. Procedural Background**

Despite the Funds performing as expected, Plaintiff's father, Luis Pino, filed this lawsuit on September 16, 2020, alleging that Defendants violated Sections 12

and 15 of the Securities Act by making false or misleading statements about the Funds. (SOF ¶¶ 144–145.) In April 2021, this Court granted Defendants' motion to dismiss the First Amended Complaint. Dkt. 94. The Ninth Circuit affirmed in part and reversed in part, directing Plaintiff to attempt to replead the alleged misstatements under the Supreme Court's *Omnicare* standard. *Pino v. Cardone Capital, LLC (Pino I)*, 2023 WL 2158802, at *4 (9th Cir. Feb. 22, 2023).

Mr. Pino died in February 2023 and was replaced as Plaintiff by his daughter. (SOF ¶ 146.) On June 26, 2023, Ms. Pino filed the Second Amended Complaint, alleging three categories of misstatements. First, Plaintiff challenges statements that the Funds would target IRRs of 15% after ten years—a time period that has not yet been reached for either Fund. (Dkt. 127 ¶¶ 56–57.) Second, Plaintiff challenges the Funds' target of annualized cash distributions of approximately 5%. (*Id.* ¶¶ 72–73.) Third, Plaintiff challenges one Instagram post about the Funds' debt, which said, in part, "[W]ho is responsible for the debt? The answer is Grant!" (*Id.* ¶ 86.)

This Court dismissed the Second Amended Complaint, but the Ninth Circuit reversed. *Pino v. Cardone Capital, LLC (Pino II)*, 139 F.4th 1102 (9th Cir. 2025). After remand, this Court granted Plaintiff's motion for class certification in March 2026, and class notice was issued to the investors in Funds V and VI on May 8, 2026. The opt-out period ended on July 14, 2026; more than 850 investors, representing approximately $36.2 million of invested capital, opted out. (SOF ¶ 149.) Of the $43.3 million of invested capital remaining in the class, the Funds have already returned $16.9 million in distributions. (*Id.* ¶ 150.) As a result, the maximum amount of invested capital remaining for rescission would be $26.4 million, which is continuing to decline every month as more cash distributions are made. (*Id.* ¶¶ 150–151.)

## III. ARGUMENT

The Court should deny Plaintiff's motion for summary judgment and grant Defendants summary judgment on all of Plaintiff's claims. Plaintiff cannot establish a "genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), as to the essential

elements of "loss," *In re Broderbund/Learning Co. Sec. Litig.*, 294 F.3d 1201, 1205 (9th Cir. 2002), and falsity, 15 U.S.C. § 77*l*(a)(2). But even if Defendants were not entitled to summary judgment, there would still be material factual disputes as to all of Plaintiff's claims. In no event, therefore, is Plaintiff entitled to summary judgment.

**A. Plaintiff Cannot Prove Loss.**

As a threshold matter, Plaintiff must—but cannot—establish that she and the class members suffered loss. Most fundamentally, Plaintiff must have Article III standing to sue on behalf of the class, and all class members must have Article III standing to recover in the case. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). To possess Article III standing, Plaintiff and all class members must "have been *concretely harmed* by" Defendants' alleged "statutory violation." *Id.* at 427. And to prove concrete harm caused by Defendants, Plaintiff must prove that she and class members suffered a loss on their investments. *Ylitalo v. Automatic Data Processing, Inc.*, 2026 WL 674423, at *4-6 (D.N.J. Mar. 10, 2026); *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 246 (S.D.N.Y. 2004).

In addition to Article III, Section 12(a)(2) independently requires loss as an element of Plaintiff's claim. The Ninth Circuit has held that "there can be no recovery" under Section 12(a)(2) "unless the purchaser has suffered a loss." *Broderbund*, 294 F.3d at 1205. A plaintiff thus must "demonstrate damages to recover under section 12." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1029 (9th Cir. 2005).

Plaintiff has argued otherwise based on *Casella v. Webb*, 883 F.2d 805 (9th Cir. 1989), but that case (which predates *Broderbund* and *Daou*) does not hold that Section 12 plaintiffs need not prove loss. It holds only that plaintiffs need not prove loss *causation*. There was no dispute that the plaintiffs in *Casella* suffered "economic loss"—the partnership in which they invested had "filed for bankruptcy." *Id.* at 807–08. Accordingly, the defendant's argument was not that the plaintiffs failed to prove loss, but that they failed to prove that "the misrepresentations or omissions *caused* the harm." *Id.* at 808 (quotation marks omitted) (emphasis added). That is the only

argument the Ninth Circuit rejected, holding that "[i]f the misrepresentations were material, the [plaintiffs] were entitled to restitution whether or not the misrepresentations *caused* the bankruptcy." Id. (emphasis added). The court never held the plaintiffs could seek rescission without *any* loss.

Indeed, the Ninth Circuit rejected Plaintiff's reading of *Casella* in *Daou*. There, the Ninth Circuit cited *Casella* as holding that "[c]ausation . . . is not a necessary element of a prima facie case under section 12." 411 F.3d at 1029. Notwithstanding this lack of a causation requirement, the Ninth Circuit still held that a "purchaser must . . . demonstrate damages to recover under section 12." *Id*. *Casella*'s only limitation on the loss requirement is that "a plaintiff is entitled to recovery whether or not the misrepresentations *caused* the alleged damage." *Id*. (emphasis added). *Casella* is thus irrelevant here, where Defendants do not rely on Plaintiff's inability to prove loss causation.

The fatal defect with Plaintiff's claim is that she cannot prove the *fact* of loss—*any* loss. And on that issue, the law is clear: "there can be no recovery" under Section 12(a)(2) "unless the purchaser has suffered a loss." *Daou*, 411 F.3d at 1029. Applying that rule, courts uniformly reject Section 12(a)(2) claims where, as here, plaintiffs' investments have increased in value above the purchase price, such that "rescission would result in [investors] receiving less than the actual value of the shares." *Siemers v. Wells Fargo & Co*., 2007 WL 1456047, at *4-5 (N.D. Cal. May 17, 2007). In *Siemers*, for example, the court granted summary judgment to Section 12(a)(2) defendants because, even though the plaintiff had not sold his investments in the defendants' fund, the investments had increased in value. 2007 WL 1456047, at *3-5. The plaintiff thus had "profited from the transactions at issue" and could not prove "cognizable loss under Section 12(a)(2)." Id. at *4-5. Numerous other cases agree. *E.g.*, *Ylitalo*, 2026 WL 674423, at *4-6; *Twigg v. AbbVie Inc.*, 265 N.E.3d 955, 968-69 (Ill. App. Ct. 2025); *Ong ex rel. Ong v. Sears, Roebuck & Co.*, 2005 WL 2284285, at *14-16 (N.D. Ill. Sept. 14, 2005); *Merzin v. Provident Fin. Grp., Inc.*, 311 F. Supp.

2d 674, 684 (S.D. Ohio 2004); *AOL Time Warner*, 381 F. Supp. 2d at 246.[1]

Even more fundamentally, Plaintiff's interpretation of Section 12(a)(2) as not requiring loss conflicts with Article III of the U.S. Constitution. To have standing to sue in federal court, Plaintiff and all class members must "have been *concretely harmed* by" Defendants' alleged "statutory violation." *TransUnion*, 594 U.S. at 427. And if Plaintiff has not suffered any loss on her investments, she has not been concretely harmed by any alleged violation of Section 12(a)(2). Plaintiff contends "[t]he injury occurred when Class Members purchased these securities" (Opp. 10), but she cites no case supporting that theory. For good reason: purchasing a security obviously cannot constitute a concrete harm when the security has *increased* in value. *Ylitalo*, 2026 WL 674423, at *5. Moreover, Section 12(a)(2) does not require reliance, so Plaintiff neither alleges nor proves that class members invested *because of* Defendants' alleged misstatements. Even if the mere purchase of a security could constitute injury, therefore, that injury cannot support standing because it is not "fairly traceable to the challenged conduct of the defendant." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The "mere receipt of a misleading statement," untethered to any concrete "harm[] that may follow from a plaintiff's *reliance* upon the misrepresentation," cannot satisfy Article III. *Ylitalo*, 2026 WL 674423, at *6.

Under this precedent, Plaintiff's Section 12(a)(2) claim fails as a matter of law because the undisputed facts establish that neither she nor any other investor has suffered a loss on their investments in the Funds. It is undisputed that the current value of the Funds' assets exceeds the amounts invested by class members. (SOF ¶¶ 121–122, 128–131.) It is also undisputed that Funds V and VI have consistently paid annual cash distributions averaging 5.9% and 4.6% to date, respectively. (*Id.*

---

[1] This rule is not limited to so-called "liquid" investments, as Plaintiff has argued. *E.g.*, *Com. Union Assur. Co. v. Milken*, 17 F.3d 608, 608, 610, 615 (2d Cir. 1994) (requiring proof of "compensable damages" to rescind partnership interest that "was not a liquid asset"). Nor does the rule depend on a plaintiff's ability to *sell* their investments—an increase in value suffices. *E.g.*, *Ylitalo*, 2026 WL 674423, at *1-2, 5 (finding no loss on purchase of IRA based on yearly returns).

¶¶ 117–118.) And while Plaintiff quibbles with whether the Funds' IRRs reflect what investors will receive when the properties are sold, she does not dispute the Funds' IRRs are positive, representing a current value in excess of the class members' investments. (*Id.* ¶¶ 124–126.) Neither Plaintiff nor any of her experts offer any evidence to rebut these value calculations, and neither contends that either Fund has declined in value. Because the value of an investment in the Funds exceeds the purchase price, Plaintiff and other investors have not suffered any compensable loss and cannot pursue a claim for rescission under Section 12(a)(2).

Rather than dispute these facts about the Funds' current values or claim that any investor has suffered a loss, Plaintiff can only speculate that investors "[m]ay" someday suffer a loss. (Dkt. 289-2 at 9.) But that is irrelevant to the inquiry before the Court. If Plaintiff and the class receive rescission, they will have to tender their investments *now*. What matters for purposes of loss, therefore, is the *current* value of those investments, not what might happen in the future. *Siemers*, 2007 WL 1456047, at *4-5; *Twigg*, 265 N.E.3d at 969; *Merzin*, 311 F. Supp. 2d at 684. And it is undisputed that the Funds' current values exceed the amounts invested. (SOF ¶¶ 121–122, 128–129.) But even if future possibilities mattered, Plaintiff has *no evidence* to support her bare speculation that investors may suffer a loss. She admits that both Funds have consistently paid annual returns and have maintained double-digit IRRs. (*Id.* ¶¶ 116–120, 124–125.) Neither she nor her experts identify any evidence supporting a belief that, despite the Funds' performance thus far, they will somehow fail before investors are paid. To the contrary, all the actual *evidence* shows that the Funds are on track to generate a profit for investors. (*Id.* ¶¶ 121–122, 128–130, 132–134.) Plaintiff's contrary "speculation" cannot create a "genuine and material dispute of fact" sufficient to survive summary judgment. *Javaheri v. JPMorgan Chase Bank N.A.*, 561 F. App'x 611, 612 (9th Cir. 2014); *accord* *TC Rich, LLC v. Shaikh*, 2021 WL 1254359, at *4 (C.D. Cal. Feb. 22, 2021).

For all these reasons, Defendants are entitled to summary judgment on all of

Plaintiff's claims. But even if that were not true, there would at least be material disputes of fact as to whether Plaintiff or class members have suffered loss. Plaintiff does not contend otherwise, instead arguing (incorrectly) that loss is not required. (Dkt. 289-2 at 7–9.) Indeed, Plaintiff affirmatively argues in opposition to Defendants' motion for summary judgment that "genuine disputes about the value of Defendants' securities . . . preclude summary judgment." (*Id.* at 9.) Those supposed disputes do not suffice to avoid summary judgment in Defendants' favor. (Dkt. 295 at 2 & n.1.) But if this Court were to agree with Plaintiff that these are genuine factual disputes as to loss, they preclude a grant of summary judgment to Plaintiff.

**B. Plaintiff Cannot Prove Material Falsity.**

Plaintiff's claims further fail because she lacks evidence from which a reasonable jury could find that Defendants made a materially false or misleading statement of fact concerning the Funds. 15 U.S.C. § 77*l*(a)(2). Even if that were not true, material disputes of fact would make summary judgment for Plaintiff improper.

**1. Defendants' targets were not materially false or misleading.**

Plaintiff cannot prove Defendants' targets of a 15% IRR and 5% annual cash returns for Funds V and VI were materially false or misleading. Plaintiff concedes those targets were statements of opinion (Mot. 8), which are actionable only in three "special circumstances: subjective falsity, embedded statements of fact, and misleading omissions." *In re Finjan Holdings, Inc.*, 58 F.4th 1048, 1055 (9th Cir. 2023) (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184-89 (2015)). Plaintiff does not seek summary judgment on a theory that Defendants' targets were subjectively or objectively false.[2] Instead, she seeks summary judgment on a theory that Defendants' targets were misleading because Defendants did not disclose the existence of the SEC's publicly available letter requesting that Fund V remove the 15% IRR target from its Offering Circular. That theory fails as a matter of law.

[2] Defendants are entitled to summary judgment on that theory. (Dkt. 274 at 13–19.)

***First***, Plaintiff's SEC letter theory cannot support any claim related to Fund V's 5% cash-distribution target or to any target or projection for Fund VI. The SEC letter addressed only Fund V's 15% IRR target. (SOF ¶¶ 33, 98.) The SEC did not mention Fund V's 5% cash target and did not consider Fund VI at all. Plaintiff thus does not and cannot argue that the letter would be relevant to Fund V's 5% cash target or any of Fund VI's targets—much less render those targets materially false or misleading.

***Second***, Plaintiff's theory fails because Defendants did disclose the SEC comments. Defendants publicly filed their response, which included a summary of the SEC's statement requesting removal of the target. (SOF ¶¶ 36, 103.) Every investor had access to that response (and the SEC letter) before investing. (*Id.* ¶ 103.)

***Third***, the SEC letter did not contradict Fund V's 15% IRR target. Contrary to Plaintiff's assertions, the SEC did not find or state that "*Cardone* did not have a basis to project a 15% IRR." (Mot. 9 (emphasis added).) The letter referenced only Fund V's "limited operations" and the fact that Fund V had "not paid any distributions to date"—which obviously was not referring to Cardone Capital or Mr. Cardone, as it is undisputed that they, unlike Fund V, had historical operations and had paid distributions. (SOF ¶¶ 33, 73–80, 98–99.) Nothing in the letter rejected or addressed Defendants' analyses, track record, investment strategy, or any other factor supporting Defendants' 15% IRR target. The SEC's comment was directed to Fund V itself, as the SEC made clear not only in the letter but also in a subsequent call. (*Id.* ¶ 100.)

Although Fund V itself had no history, Cardone Capital and Mr. Cardone *did* have a substantial history of success, including achieving IRRs of 15% or higher in prior deals, that supported the 15% IRR target. (*Id.* ¶¶ 81, 97.) Mr. Cardone has more than thirty years of experience investing in income-producing multifamily real estate. (SOF ¶ 69.) Through numerous successful funds, Cardone Capital has built a $5.4 billion portfolio of approximately 15,000 multifamily units. (*Id.* ¶ 70.) For example, before launching Fund V, Mr. Cardone had purchased over 40 multifamily properties comprising over 4,500 units, with a total purchase price exceeding $650 million. (*Id.*

¶ 73.) By the time Fund V was finalized, Mr. Cardone had sold over 20 of those properties at appreciated values, even when holding the properties for a shorter duration than anticipated for Fund V. (*Id.* ¶¶ 74–75.) And Defendants' previous funds had already demonstrated positive cash flows and sizeable distributions. For example, Cardone Equity I paid $123.73 per $1,000 invested (12.3% annual cash return), and Cardone Equity II paid $114.33 per $1,000 invested (11.4% annual cash return). (*Id.* ¶ 78.) As of June 30, 2018, Cardone Capital's projected IRRs for Funds I, II, and III were 27.2%, 26.5%, and 14.5%, respectively, and for the remainder of its investment portfolio the average projected IRR was 31.9%. (*Id.* ¶¶ 79–80.) This history amply supported Defendants' targets. *See In re Adobe Sys., Inc. Sec. Litig.*, 787 F. Supp. 912, 920 (N.D. Cal. 1992) (holding "historical earnings patterns" were a reasonable basis for earnings projections), *aff'd*, 5 F.3d 535 (9th Cir. Sept. 9, 1993); *Weinberger v. Jackson*, 1990 WL 260676, at *2 (N.D. Cal. Oct. 11, 1990) (holding company's experience with projections was a reasonable basis for later projections).

Defendants' record of success was bolstered by their disciplined investment strategy of hand-selecting quality properties and seeking optimal property exits when market conditions best support the targeted returns. Defendants also designed and employed a rigorous underwriting process—including due diligence, market valuations, and total return analyses—before purchasing properties to focus only on properties that could support the targeted returns. (SOF ¶ 91.)

Finally, conservative "property-level pro formas" analyzing Fund V's properties for institutional lenders also support the 15% target. At the property level, more than half of the pro formas for Fund V's properties showed overall IRRs of 15% or greater, and the average IRR for all Fund V pro formas was 14.51%. (SOF ¶ 154.) For Fund VI, 82% of the pro formas showed an IRR of 15% or greater, with a total average IRR of 17.3%. (*Id.*)

The SEC letter did not address, much less undermine, any of this support for Fund V's 15% IRR target. Accordingly, no reasonable jury could find that omitting

the letter "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exist[ed]." Barker v. Nextracker Inc., 827 F. Supp. 3d 1214, 1222 (N.D. Cal. 2026) (cleaned up). The "state of affairs . . . that actually exist[ed]," *id.*, was that Defendants based their target on a substantial history of similar results and a rigorous investment strategy designed to produce the projected returns. The SEC letter did not discuss that reality. And the factors identified by the SEC—Fund V's limited operations and lack of distributions to date—were not hidden by Defendants in any way. Because nothing in the SEC letter addresses, much less undermines, the actual "basis for [Defendants'] opinion" or suggests that Defendants' target did not "fairly align[] with the information in [their] possession," omitting the letter could not have rendered the target materially misleading. *Omnicare*, 575 U.S. at 189, 194.

***Fourth***, even if the SEC letter had disagreed with Defendants' 15% IRR target (it did not), Defendants had no obligation to disclose that disagreement. Numerous decisions hold that when a company "has a reasonable basis" for an opinion, the company has no obligation to disclose the mere fact that a government agency expressed disagreement with the opinion, even when such a disagreement exists (and, as discussed, here it did not). *E.g.*, *Tongue v. Sanofi*, 816 F.3d 199, 214 (2d Cir. 2016).[3] As the court in *Tongue* explained, reasonable investors are "no doubt aware that projections provided by issuers are synthesized from a wide variety of information, and that some of the underlying facts may be in tension with the ultimate projection set forth by the issuer." 816 F.3d at 211. Accordingly, the court held as a matter of law that defendants projecting FDA approval for their drug were not required to disclose negative FDA feedback. *Id.* at 211-12. Because the company

[3] *Accord, e.g.*, *In re Amarin Corp. PLC Sec. Litig.*, 2022 WL 2128560, at *3 (3d Cir. June 14, 2022); *Homyk v. ChemoCentryx, Inc.*, 2025 WL 4110430, at *6-7 (N.D. Cal. Aug. 15, 2025); *Strezsak v. Ardelyx Inc.*, 2024 WL 1160900, at *6-7 (N.D. Cal. Mar. 18, 2024); *Pardi v. Tricida, Inc.*, 2024 WL 1056013, at *7-8 (N.D. Cal. Mar. 11, 2024); *In re Dynavax Sec. Litig.*, 2018 WL 2554472, at *7-8 (N.D. Cal. June 4, 2018); *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 541-42 (S.D.N.Y. 2015).

"conducted a meaningful inquiry and ha[d] a reasonable basis" for its projection, its statements could not "be misleading merely because the FDA disagreed with the conclusion." *Id.* at 214. Put simply, the defendants "need not have disclosed the FDA feedback merely because it tended to cut against their projections" or "because [they] failed to disclose information that ran counter to [their] opinion." *Id.* at 212; *see also Amarin*, 2022 WL 2128560, at *3 (dismissing claim defendant misleadingly omitted SEC concerns about study when "the topline results announced by [defendant] did not lack a reasonable basis").

Courts in this Circuit have reached the same conclusion. The court in *Homyk* granted summary judgment to defendants accused of misleadingly omitting FDA criticism from their positive characterization of study results. 2025 WL 4110430, at *7-14. The court expressly adopted the Second Circuit's approach from *Tongue*, holding that "a defendant's failure to disclose FDA feedback or other scientific criticism—even when repeating serious concerns" cannot "constitute[] a material omission rendering an opinion misleading and actionable" when the defendant's opinions "did not lack a reasonable basis." *Id.* at *6 (cleaned up). The court thus found that because the defendants' projections and interpretations of data were "reasonable," their statements could not "be misleading merely because the FDA disagreed with the[ir] conclusion." *Id.* at *9-10 (cleaned up); *accord id.* at *11, 13. Similarly, the court in *Strezsak* dismissed a claim that the defendants omitted FDA criticisms from their projections, finding that "the FDA's statements at most constitute 'contrary views' to [d]efendants' statements concerning the sufficiency of [study] data—communications that courts have not required similarly situated [d]efendants to disclose." 2024 WL 1160900, at *6. The "[d]efendants were free to express optimism" and "had no obligation to share every opinion raised by the FDA," even if the FDA "presented views contrary to those expressions of optimism." *Id.* at *7; *accord Pardi*, 2024 WL 1056013, at *7-8; *Dynavax*, 2018 WL 2554472, at *7.

To argue otherwise, Plaintiff mischaracterizes *Omnicare* as creating automatic

liability for an alleged failure to disclose "that the Federal Government [is] taking the opposite view" of an opinion. (Mot. 10 (misleadingly quoting *Omnicare*, 575 U.S. at 188-89).) That is incorrect. The relevant portion of *Omnicare* addressed a specific hypothetical, in which a company offers "an unadorned statement of opinion about legal compliance: 'We believe our conduct is lawful.'" 575 U.S. at 188. The Court held *that specific* "legal opinion[]" could be misleading "if the issuer made the statement in the face of its lawyers' contrary advice, or with knowledge that the Federal Government was taking the opposite view." *Id.* In other words, an opinion that "our conduct is lawful" could be misleading if the company did not disclose that its lawyer or the federal government had told it that its conduct was *not* lawful.

*Omnicare*'s hypothetical bears no resemblance to this case. Defendants did not offer a legal opinion; they disclosed the returns they were targeting. And the SEC did not make any findings as to the truth of those targets—as the Ninth Circuit held, the SEC "did not take a position on the . . . objective falsity of the projections." *Pino II*, 139 F.4th at 1111. So the SEC was not "taking the opposite view," *Omnicare*, 575 U.S. at 188, that Fund V would *not* generate the targeted returns. But even if the SEC letter "tended to cut against [Defendants'] projections" (which it did not), Defendants still had a "reasonable basis" for their target and thus "need not have disclosed the [SEC] feedback." *Homyk*, 2025 WL 4110430, at *13 (quotation omitted).

Plaintiff also mischaracterizes the Ninth Circuit's decision in *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784 (9th Cir. 2017), which does not support her argument. For one thing, *Atossa Genetics* was decided on a motion to dismiss, not a motion for summary judgment. For another, the statement in *Atossa Genetics* was not false because "the FDA was raising concerns about [a] drug" (Mot. 11), but because the defendant claimed that "FDA clearance risk has been achieved" when, in fact, "the FDA had not given clearance." *Atossa Genetics*, 868 F.3d at 801–03. In this case, as in *Tongue*, *Homyk*, and *Strezsak*, there is no similar direct conflict between

the SEC letter and Defendants' honestly held and reasonable 15% IRR target.[4]

Plaintiff's other arguments do not support a different conclusion. First, the Ninth Circuit's holding that Plaintiff plausibly *pleaded* falsity in her complaint (Mot. 11) is irrelevant to whether the actual *evidence* supports a finding of material falsity. *Ho v. City of Long Beach, Public Works*, 2022 WL 17682677, at *22 (C.D. Cal. Oct. 24, 2022). It does not. Second, Mr. Cardone did not "guarantee" a 15% IRR or "claim[] to be Nostradamus" (Mot. 11)[5] in any communication containing Fund V's 15% IRR target. The YouTube video Plaintiff cites was not about Fund V (or Fund VI) and did not make any projections about Fund V's returns. (Ex. 282, *available at* https://www.youtube.com/watch?v=OoeJkZZGa2c.) Rather, it was a 45-minute instructional video on financial literacy, and the "math" it contained was merely a general explanation of how a real estate investment mathematically could produce a 15% annualized return. (*Id.*; Cardone Decl. ¶ 16.) The video was not an advertisement for Fund V (or Fund VI) and made no representations about the IRR for any actual investment. Similarly, the Instagram post that Plaintiff mischaracterizes as "d[oing] the math for [investors]" simply included a screenshot from the YouTube video. (Mot. 11–12.) Like the video, therefore, the Instagram post presented simple math showing how an investment could generate a 15% return. The post neither mentioned Fund V (or Fund VI) nor made any representations about Fund V's returns. (*Id.*)

---

[4] *In re Perrigo Co. PLC Sec. Litig.*, 2021 WL 3005657 (S.D.N.Y. July 15, 2021), is also distinguishable. There, the defendant violated generally accepted accounting principles by failing to report a tax liability it knew the Irish Department of Revenue would likely impose. *Id.* at *6. The falsity resulted from the GAAP violation, not any conflict between the defendant's opinion and the government's opinion. *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1092–94 (9th Cir. 2010), is entirely irrelevant because it addresses only scienter under Section 10(b).

[5] Cardone did not call himself Nostradamus—he said some people call him that. A playful nickname is obviously nonactionable "puffery." *Prager Univ. v. Google LLC*, 951 F.3d 991, 1000 (9th Cir. 2020); *cf. Alexander v. Cahill*, 598 F.3d 79, 94–95 (2d Cir. 2010) ("names that imply an ability to get results" are "akin to, and no more than, the kind of puffery that is commonly seen, and indeed expected, in commercial advertisements"). So are Mr. Cardone's descriptions of himself as a "genius" or "master." (Mot. 12); *see R & A Synergy LLC v. Spanx Inc.*, 2019 WL 4390564, at *10 (C.D. Cal. May 1, 2019). In any event, Plaintiff cites only Mr. Cardone's deposition, not any marketing statement relating to Funds V or VI. (Mot. 12.)

***Fifth***, no reasonable jury could find that disclosing the SEC letter would have materially "chang[ed] the 'total mix' of information available" to investors. *In re LifeLock, Inc. Sec. Litig.*, 690 F. App'x 947, 952 (9th Cir. 2017). "[W]hether an omission makes an expression of opinion misleading always depends on context, because investors take into account the customs and practices of the relevant industry." *Golub v. Gigamon Inc.*, 847 F. App'x 368, 372-73 (9th Cir. 2021) (cleaned up) (quoting *Omnicare*, 575 U.S. at 190). And here, the SEC letter and Defendants' response were publicly filed and available on the SEC's EDGAR months before anyone invested. Although the Ninth Circuit held that this public availability did not foreclose Plaintiff's claim at the pleading stage, *Pino II*, 139 F.4th at 1111-12, it is plainly relevant to the "total mix" of information available to investors. Investors had access to the precise information Plaintiff claims was omitted, and any investor who reviewed Defendants' SEC filings would have found that information easily. *See Rubke v. Capitol Bancorp Ltd*., 551 F.3d 1156, 1162–63 (9th Cir. 2009).

Investors also would have considered Defendants' IRR target in light of Defendants' numerous "hedges" and "disclaimers." *Omnicare*, 575 U.S. at 190. Every investor signed Subscription Agreements attesting that they read and understood the disclosures in the Funds' Offering Circulars, which included unambiguous disclaimers that Defendants could not guarantee any return. (SOF ¶¶ 106–107, 110–115.) Investors who attested that they understood those warnings could not reasonably have been misled by any omission of the SEC letter into believing that Defendants were guaranteeing specific rates of return. *Tongue*, 816 F.3d at 211.

As explained, the SEC letter did not "take[] the opposite view" to Fund V's 15% IRR target. *Supra* § III.B.1; *Pino II*, 139 F.4th at 1111. Moreover, the "customs and practices" of which investors are aware include the fact that "[t]he SEC has historically disfavored forecasts and value estimates in proxy statements." *Golub*, 847 F. App'x at 373 (cleaned up). That historical practice contextualizes the SEC's request and weakens the inferences any reasonable investor would draw from that

request. *Tongue*, 816 F.3d at 212–13. The SEC's history of disfavoring projections would have supported its request that Defendants remove the target irrespective of any concerns with its accuracy. Particularly when the SEC letter described no investigation into or findings about Defendants' projections, no reasonable investor would have concluded from the letter that Defendants' target was the sort of "baseless, off-the-cuff judgment[]" that can support liability. *Omnicare*, 575 U.S. at 190.

***Sixth***, even if Defendants were not entitled to summary judgment, material disputes of fact would preclude summary judgment for Plaintiff. Because Plaintiff does not seek summary judgment on whether Defendants had a reasonable basis for the 15% IRR target, she concedes there is, at minimum, a genuine dispute of fact on that issue. Accordingly, if the Court does not conclude the undisputed record compels a finding the 15% IRR target was reasonable, that question must go to the jury. (*See* Dkt. 289-2 at 12–19 (Plaintiff arguing that material disputes of fact exist as to the target's reasonableness).) And if the jury finds that Defendants had a reasonable basis for the target, then Defendants' alleged failure to disclose the SEC letter would not be actionable. *Tongue*, 816 F.3d at 212–14; *Homyk*, 2025 WL 4110430, at *7-14; *Strezsak*, 2024 WL 1160900, at *6.

In addition, were the Court to deny summary judgment to Defendants, there would still be disputes of fact, for example, as to how reasonable investors would interpret the SEC letter, how it would affect reasonable investors' reaction to the 15% IRR target, and whether it would be material to a reasonable investor in "context" and in light of Defendants' numerous "hedges" and "disclaimers." *Omnicare*, 575 U.S. at 190. In no event, then, would Plaintiff be entitled to summary judgment on an omissions theory.

**2. The challenged statement regarding the Funds' debt obligations was not materially false or misleading.**

Plaintiff is also not entitled to summary judgment as to the falsity of an Instagram post stating: "One question you might want to ask is, who is responsible

for the debt? The answer is Grant!" (Dkt. 127 ¶ 86.) Here too, Defendants are entitled to summary judgment because no reasonable jury could find this statement to be materially false or misleading. But even if this Court were to conclude that a jury *could* find the statement to be false or misleading, a jury could also find otherwise. In no event, therefore, should Plaintiff receive summary judgment.

***First***, no reasonable investor could have interpreted the Instagram post the way Plaintiff contends: that Mr. Cardone was promising to personally pay the service on the debt out of his own pocket. The Funds' Offering Circulars unambiguously informed investors that income from the properties would be used to pay the debt before any distribution to investors. (SOF ¶¶ 108, 139–141.) And every investor swore that they read and understood those disclosures. (*Id.* ¶¶ 110, 112.) Given this "context," no investor would have interpreted the Instagram post in the way Plaintiff asserts. *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276-77 (9th Cir. 2017).

Indeed, Melissa Harless, a former Cardone Capital investor-relations associate who spoke with thousands of investors, never encountered a single investor who "believed Grant Cardone personally was going to pay the service on the debt used to acquire properties for Cardone funds." (SOF ¶ 142.) Ms. Harless confirmed that debt servicing was well-understood to be paid from the properties' "operating income," not by Mr. Cardone personally. (*Id.* ¶ 143.) Plaintiff has cited one email from an investor to Ms. Harless to support Plaintiff's interpretation of the Instagram post (Dkt. 289-2 at 23–24), but that email was not about the challenged post (Dkt. 295-1 ¶ 147). Indeed, the email *could not* have been about the Instagram post because the investor sent it almost one year before the post even existed. (*Id.*) That email thus cannot establish that reasonable investors would have interpreted the statement in the unreasonable way Plaintiff proposes. What the post was explaining to investors is that they are not personally responsible for the debt, which is true, because no investor would be financially obligated for anything beyond the amount of their

initial investment. Beyond that, in terms of being "responsible for the debt," Mr. Cardone did personally guarantee the debt in any and all circumstances when a lender required a guaranty and was responsible for securing the debt to acquire the properties in the first place. (SOF ¶ 138.)

For all these reasons, Defendants are entitled to summary judgment as to falsity of the Instagram post. But even if the Court were to disagree, genuine disputes as to how a reasonable investor would have understood the post in context and in light of the Offering Circulars' unambiguous description of how debt payments would be made preclude summary judgment for Plaintiff.

***Second***, even if the Instagram post could reasonably be read as false, Defendants are still entitled to summary judgment because every investor "kn[ew] of such untruth." 15 U.S.C. § 77*l*(a)(2). As noted, the Funds' Offering Circulars clearly disclosed that income from the properties would be used to pay the debt before distributions to investors. Plaintiff has admitted that any investor who reviewed those disclosures would have understood how the Funds' debts would be paid, without needing any expertise in investing. (SOF ¶ 109.) And every investor, including Mr. Pino, attested in writing that they *did* read and understand those disclosures. (*Id.* ¶¶ 110, 112.) Investors are bound by that attestation, which establishes *actual*—not merely constructive—knowledge. Even treating actual knowledge as an affirmative defense, *but see* *N.J. Carpenters Health Fund v. Rali Series 2006-QO1 Trust*, 477 F. App'x 809, 813 n.1 (2d Cir. 2012), investors' admitted knowledge of the truth forecloses their Section 12(a)(2) claim based on the Instagram post. At a minimum, whether investors had actual knowledge would be a disputed question for the jury.

**C. Plaintiff's Section 15 Claim Fails as a Matter of Law, but at a Minimum There are Genuine Factual Disputes.**

Plaintiff's control person claim under Section 15 fails along with her Section 12(a)(2) claim. A plaintiff may sue control persons under Section 15 only if she can establish a predicate securities violation by the controlled entity. 15 U.S.C. § 77*o*.

Because Pino does not have a viable Section 12 claim, her Section 15 claim also fails.

Even if Plaintiff could prove a predicate violation, disputed facts as to Section 15's "'good faith' defense," *In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1054 (N.D. Cal. 2008), preclude summary judgment in her favor. Section 15 provides a defense when a "controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77*o*(a). Plaintiff does not seek summary judgment on this defense—for good reason. Copious evidence established Mr. Cardone and Cardone Capital genuinely, reasonably, and in good faith believed every challenged statement was true. (*E.g.*, SOF ¶¶ 96, 104–105.) Indeed, the evidence is undisputed. (Dkt. 274 at 14–18.) At minimum, however, Plaintiff's failure to seek summary judgment on Mr. Cardone's and Cardone Capital's good faith is a concession there are at least genuine factual disputes as to that issue. These disputes preclude summary judgment for Plaintiff on her Section 15 claim.

**D. Plaintiff's Failure to Prove Her Claims Moots the Rest of Her Motion.**

Plaintiff also seeks summary judgment as to whether Defendants are "statutory sellers" under Section 12 and whether Mr. Cardone and Cardone Capital are "control persons." (Mot. 15, 19.) Those aspects of Plaintiff's motion are moot, however, because she cannot establish the substantive elements of any claim. It does not matter whether Defendants are subject to Sections 12 or 15 when Plaintiff cannot prove a claim under either section. Similarly, there is no reason to consider the interest rate for a potential rescission payment when Plaintiff is not entitled to rescission because she cannot prove loss or falsity. (Mot. 17–19.) Anyway, it would be premature to decide on the amount of a hypothetical interest award before trial. *SEC v. Interlink Data Network of L.A., Inc.*, 1993 WL 603274, at *13 (C.D. Cal. Nov. 15, 1993). Even according to Plaintiff, an interest calculation depends on "a number of factors," and Plaintiff does not seek summary judgment—or even present any evidence—on *any*

of those factors. (Mot. 18.) There is no reason for the Court to issue an advisory decision on prejudgment interest at this time.

In any event, Plaintiff is not entitled to 7% compound interest. Plaintiff seeks 7% interest under California law (Mot. 18), but "federal law controls" the interest rate for claims brought under "federal securities laws." *Koehler v. Pulvers*, 614 F. Supp. 829, 850 (S.D. Cal. 1985); *accord* *SEC v. Pattison*, 2011 WL 723600, at *4 (N.D. Cal. Feb. 23, 2011). Applying federal law, courts typically apply the weekly average 1-year Treasury yield for prejudgment interest in Section 12 cases. *See* *Miles-Hickman v. David Powers Homes, Inc.*, 2009 WL 1797872, at *1 (S.D. Tex. June 24, 2009) (awarding simple prejudgment interest at the rate provided by 28 U.S.C. § 1961); *accord* *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1164 (9th Cir. 2001). And in Section 12 cases, "interest is calculated on the basis of simple interest rather than compound interest." 5D Arnold S. Jacobs, Disclosure & Remedies Under the Sec. Laws § 3:217; *id.* § 20:61 (same). Even if California law governed (it does not), Plaintiff admits "California law" also "provides for simple interest" rather than compound interest. (Mot. at 19 n.3.) Plaintiff cites no case awarding compound interest to a Section 12(a)(2) plaintiff.

## IV. CONCLUSION

The Court should deny Plaintiff's motion for summary judgment.

Dated: November 16, 2026 KING & SPALDING LLP

By: */s/ Joseph N. Akrotirianakis*
JOSEPH N. AKROTIRIANAKIS
Attorneys for Defendants

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendants, certifies that this brief is no more than 25 pages long, which complies with the page limit in the Court's Standing Order.

Dated: November 16, 2026 KING & SPALDING LLP

By: *<u>/s/ Joseph N. Akrotirianakis</u>*
JOSEPH N. AKROTIRIANAKIS

## CERTIFICATION REGARDING AI USE

The undersigned, counsel of record for Defendants, certifies that no Artificial Intelligence was used in the preparation of this brief or in any corresponding materials.

Dated: November 16, 2026 KING & SPALDING LLP

By: *<u>/s/ Joseph N. Akrotirianakis</u>*
JOSEPH N. AKROTIRIANAKIS